## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

|

SACHA BERLIK, BERIT BLOCK,                    |
PAUL DEAN, JENNIFER GOLDBERG,                 |
JAN HEUMUELLER, SHANE KEATS,                  |
CHRISTOPHER LE MAY, CHRISTOPHER              |
LOBDELL, AND LAURA WALTON,                    |

|

               Plaintiffs,          |    Civil Action No. _____

|

      v.                                      |

|    JURY TRIAL REQUESTED

MICHAEL BAKER, EDWARD CRAWLEY,               |
JEFFREY BUSSGANG, FLYBRIDGE CAPITAL          |
PARTNERS II, L.P., FLYBRIDGE NETWORK         |
FUND II, L.P., JEFFREY FAGNAN, ATLAS         |
VENTURE FUND VIII, L.P., ACCOMPLICE          |
FUND I, L.P., ACCOMPLICE FUND II, L.P.,      |
JOHN JARVE, MENLO VENTURES X, L.P.,          |
MENLO ENTREPRENEURS FUND X, L.P.,            |
MMEF X, L.P., DON BUTLER, THOMVEST           |
VENTURES LTD., THOMVEST VENTURE              |
CAPITAL SRL, DAN DEMMER, WILLARD             |
SIMMONS, MARK JUNG, SANDRO                    |
CATANZARO, and R. BRUCE JOURNEY,             |            |

|

               Defendants.          |

———————————————————————

## COMPLAINT

Plaintiffs, by their attorneys, allege as follows:

### SUMMARY

1.     DataXu, Inc., was a privately held corporation and digital software company

controlled by Defendants, with its principal place of business in Massachusetts.

2.     Plaintiffs are and were: the former owner of a company acquired by DataXu in 2011

and 2012, partially in exchange for stock in DataXu, and DataXu employees who purchased

shares in DataXu through various employee stock option plans.

1

3.      Defendants devised and executed a scheme, artifice, and devices to defraud by promoting, offering, and selling DataXu securities to Plaintiffs, and concealing and not disclosing material information affecting the value of these securities.

4.      Specifically, Defendants sold DataXu securities, including employee stock options and capital (common and preferred) stock to Plaintiffs, while intentionally and recklessly concealing and failing to disclose that Defendants (1) would create or had created fraudulent devices, including a deemed liquidation provision, an insider-note repayment scheme, and a retention plan (collectively, the "Contribution-Shifting Devices") that could and would deprive Plaintiffs of the value of their securities upon the sale or merger of the company; (2) could and would execute these fraudulent devices upon the sale or merger of DataXu and (3) through the fraudulent implementation of the Contribution-Shifting Devices, cause the value of Plaintiffs' contributions and interests in DataXu to be transferred directly to Defendants, resulting in the total loss to Plaintiffs of their investments.

5.      The Contribution-Shifting Devices, which Defendants concealed from Plaintiffs, ensured that Plaintiffs would neither recoup their investments in DataXu stock nor receive any profits on that stock unless DataXu either (a) succeeded in making a public offering of its stock or (b) was sold for a purchase price in excess of the monetary amounts contributed by Defendants, plus a return.

6.      On information and belief, in or about November 2015, Defendants caused DataXu to decline an offer to be acquired by Amobee, Inc. for approximately $380 million, an amount more than twice the amount for which DataXu was ultimately acquired by Roku, Inc. ("Roku") in November 2019.

7.     On or about October 22, 2019, Defendants entered into a merger agreement entitled, "Agreement and Plan of Merger" with, among others, the publicly traded corporation, Roku, by which they agreed to sell or merge DataXu for $150 million or more, to be paid in cash and Roku securities ("Merger Agreement").

8.     On or after October, 22, 2019, Defendants provided Plaintiffs with written notice of the Merger Agreement, which was the first time Plaintiffs became aware of the impending Roku merger.

9.     On or about November 8, 2019, Defendants executed the Merger Agreement, merging DataXu with a Roku subsidiary, Delaware Acquisition Company, Inc. Thereupon Defendants, and only Defendants, received $150 million in cash and Roku common stock.

10.     Defendants' execution and performance of the Merger Agreement triggered the Contribution-Shifting Devices, which caused Plaintiffs to suffer the total loss of their investments in DataXu securities.

11.     Defendants were self-interested directors, owners, creditors, and controllers of DataXu who, individually and as agents, devised and executed, and joined and participated, in a scheme, artifice, and device to defraud Plaintiffs of the value of their securities by creating, and then concealing and failing to disclose the existence and intended purpose of the Contribution-Shifting Devices, and the effect these devices could – and would – have on the value of Plaintiffs' DataXu securities.

12.     Defendants knowingly and intentionally sold DataXu common stock to Plaintiffs at per-share valuation prices without informing them that these valuations did not reflect the effects that Defendants' Contribution-Shifting Devices could and would have on the share values.

13.    Defendants also knowingly and intentionally paid a portion of the purchase price for the acquisition of one Plaintiff's interest in a separately-owned company in preferred shares of DataXu at per-share valuation prices without informing him that this valuation did not reflect the effects that Defendants' Contribution-Shifting Devices could and would have on the share values.

14.    If Defendants had disclosed the existence of, and risks the Contribution-Shifting Devices posed to the value of Plaintiffs' shares, none of the Plaintiffs would have made the capital contributions they made on the terms they did.

15.    Defendants' actions and inactions, including their systematic offering and selling of DataXu securities to Plaintiffs, creation and implementation of the Contribution-Shifting Devices, and intentional and reckless concealment and non-disclosure of the risks that the Contribution-Shifting Devices posed to the value of Plaintiffs' securities, were and are subject to the antifraud and other provisions of the federal securities laws, including the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act").

16.    Defendants' actions and inactions, as described herein, violated the antifraud and other provisions of the federal securities laws and created private rights of action and claims in favor of Plaintiffs under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

17.    The Court has jurisdiction of this action under 28 U.S.C. § 1331.

18.    This district is a proper venue for this action under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District of Massachusetts.

## PLAINTIFFS

19.    Plaintiffs are individuals who obtained DataXu securities as compensation, cash, and, in one instance, partial payment for an acquired business.

20.    Plaintiff Sacha Berlik ("Berlik" and the "C-1 Plaintiff"), who resides in Cologne, Germany, was an owner of Mexad LTD ("Mexad"), which was acquired by DataXu in late 2011 and early 2012. As partial consideration for the purchase of Mexad, Defendants paid Berlik in series C-1 preferred stock of DataXu. Berlik also became DataXu's Managing Director of Europe, from 2012 to 2015.

21.    The following Plaintiffs were DataXu employees (the "Employee Plaintiffs"), who accepted stock-based compensation in lieu of cash compensation and/or as additional employment incentive, and exercised their stock options when they vested at the strike (exercise) price Defendants presented to Plaintiffs based on the latest "fair market value" determination pursuant to Internal Revenue Code § 409A ("409A valuation") of DataXu common stock:

      a.    Berit Block, who resides in London, U.K.;

      b.    Paul Dean, who resides in Chicago, Illinois;

      c.    Jennifer Goldberg, who resides in Scotch Plains, New Jersey;

      d.    Jan Heumueller, who resides in Cologne, Germany;

      e.    Shane Keats, who resides in Cambridge, Massachusetts;

      f.    Christopher Le May, who resides in Sawbridgeworth (Hertfordshire), U.K;

      g.    Christopher Lobdell, who resides in Glen Ellyn, Illinois; and

      h.    Laura Walton, who resides in Oak Park, Illinois.

## DEFENDANTS

22.    Defendants include one or more founders; holders, singly or jointly, of a majority of DataXu common stock; holders of DataXu preferred stock other than C-1 preferred stock; holders of DataXu debt, specifically, convertible promissory notes; and directors and executive officers of DataXu, all of whom received a portion of the $150 million, or more, that Roku paid to purchase (and merge) DataXu.

23.    All Defendants held DataXu capital stock, either preferred or common or both, until all DataXu securities were extinguished on or after November 8, 2019:

      a.    Michael Baker ("Baker"), beginning in approximately 2007 or 2008 and continuing through November 8, 2019, served as a DataXu director, Chief Executive Officer ("CEO"), and president. Baker was also a creditor of DataXu, and from March 2009 to March 2010, and from September 23, 2019, to November 8, 2019, Baker served as DataXu's treasurer and secretary. After the merger of DataXu into Roku, Baker joined Flybridge Capital Partners ("Flybridge Capital").

      b.    Edward Crawley ("Crawley")was a founder of DataXu and director from 2007 to 2011.

      c.    Willard Simmons ("Simmons") was a DataXu founder.

      d.    Sandro Catanzaro ("Catanzaro")was a DataXu founder.

      e.    Jeffrey Bussgang ("Bussgang") was a DataXu director from approximately 2008 or 2009 and continuing through November 8, 2019. Bussgang was and is a partner of Flybridge Capital and the author of *Mastering the VC Game: A Venture Capital Insider Reveals How to Get from Startup to IPO on Your*

*Terms*, published in 2010 (hereafter, "*The VC Game*"). In addition to acting on his own behalf, Bussgang acted as agent for Flybridge Capital Parners II, L.P. and Flybridge Network Fund II, L.P..

f.    Flybridge Capital Partners III, L.P. and Flybridge Network Fund III, L.P. were preferred stockholders of Series A, B, C, D, E, and F preferred stock, and convertible promissory noteholders in the principal amount of $750,000.

g.    Jeffrey Fagnan ("Fagnan") was a DataXu director from approximately 2008 or 2009 and continuing through November 8, 2019. Fagnan was a partner of Atlas Venture and in 2015 became a founding partner of Accomplice Management, LLC. In addition to acting on his own behalf, Fagnan acted as agent for Atlas Venture Fund VIII, L.P., Accomplice Fund I, L.P.; and Accomplice Fund II, L.P.

h.    Atlas Venture Fund VIII, L.P., Accomplice Fund I, L.P.; and Accomplice Fund II, L.P., were preferred stockholders of Series A, B, C, D, E, and F preferred stock and convertible promissory noteholders in the principal amount of $3,000,000.

i.    John Jarve ("Jarve") was a DataXu director from approximately 2013 and continuing through November 8, 2019. Jarve was and is a partner of Menlo Ventures. In addition to acting on his own behalf, Jarve acted as agent for Menlo Ventures X, L.P., Menlo Entrepreneurs Fund X,, L.P.; and MMEF X, L.P.

j.      Menlo Ventures X, L.P., Menlo Entrepreneurs Fund X,, L.P.; and MMEF X,

L.P. were preferred stockholders of Series B, C, D, E, and F preferred stock

and convertible promissory noteholders in the principal amount of $3,000,000.

k.      Donald Butler ("Butler") was a DataXu director from approximately 2014 and

continuing through November 8, 2019; Butler was also a managing director of,

or affiliated with, Thomvest Ventures Inc. until approximately 2018, and

Thomest Ventures LLC thereafter (together, "Thomvest Ventures"). In addition

to acting on his own behalf, Butler acted as agent for Thomvest Ventures Ltd.

and Thomvest Venture Capital SRL

l.      Thomvest Ventures Ltd. and Thomvest Venture Capital SRL were preferred

stockholders of Series D, E, and F preferred stock and convertible promissory

noteholders in the principal amount of $2,250,000.

m.      Dan Demmer ("Demmer") was a DataXu director from approximately 2013

and continuing through November 8, 2019. Demmer was also a partner of, or

affiliated with, OpenView Venture Partners, L.P. (a Boston-based venture

capital firm), served as an "Independent Committee Member," and was paid an

undisclosed amount determined by the Board as compensation for his work as

a member of the independent committee in 2019; and

n.      Mark Jung ("Jung") was a DataXu director from approximately 2013 and

continuing through November 8, 2019. Jung was also Executive Chairman of

Accela, Inc., an Advisory Director of Berkshire Partners (a Boston-based

investment firm), served as an "Independent Committee Member," and was

paid an undisclosed amount determined by the Board as compensation for his work as a member of the independent committee in 2019.

24.    Defendants knowingly and willfully devised and executed a continuing scheme, artifice and devices to defraud, by creating the Contribution-Shifting Devices, and then concealing and failing to disclose to Plaintiffs the risks that the Contribution-Shifting Devices posed to the value of the securities Plaintiffs purchased, which information was and would have been material to Plaintiffs' decisions to acquire the securities, and invest in DataXu.

### DATAXU'S BUYER

25.    Roku is a publicly held corporation headquartered in San Jose, California.

## FACTS

### CREATION OF DATAXU

26.    On information and belief, in or about 2007, two Massachusetts Institute of Technology ("MIT") students, Defendants Simmons and Catanzaro, developed and invented the software platform that would become DataXu's core asset: a demand-side platform ("DSP")—a digital platform that a service-provider owns and operates to serve users of digital advertising.

27.    On information and belief, Defendants Simmons and Catanzaro informed their MIT professor, Defendant Crawley, of their platform, and the three agreed and decided to further develop it for commercial use and profit.

28.    On August 3, 2007, Defendants Simmons, Catanzaro, and Crawley (the "Founders") incorporated BlendInfo, Inc. in the state of Delaware. BlendInfo, Inc. was subsequently renamed DataXu, Inc.

29.   DataXu's principal office was first located in Cambridge, Massachusetts; it later moved to Boston, Massachusetts, and many of the parties' decisions, actions, inactions, and transactions, described herein, occurred within the federal District of Massachusetts.

30.   On information and belief, Defendants Simmons, Catanzaro, and Crawley originally issued all or most of DataXu's then-issued and outstanding common stock to themselves.

31.   On information and belief, Defendants Simmons, Catanzon, and Crawley, singly and collectively, held a majority of the shares of DataXu common stock until November 8, 2019, when their common stock was extinguished

32.   On or after August 3, 2007, Defendant Crawley hired Defendant R. Bruce Journey as DataXu's initial chief executive officer ("CEO").

33.   In or after September 2007, Defendant Baker invested in DataXu's debt, and at some point thereafter became a Director and replaced Defendant Journey as DataXu's CEO.

34.   DataXu began operations as a startup company in May 2008.

35.   On March 3, 2009, Defendant Baker, as DataXu's President, registered DataXu as a foreign corporation doing business in the Commonwealth of Massachusetts. DataXu continued to register as a foreign corporation in Massachusetts through November 8, 2019.

36.   On October 22, 2019, Defendants formalized and executed the Merger Agreement with Roku.

37.   On or after October 22, 2019, Defendants sent a written notice to Plaintiffs, which disclosed the Merger Agreement and other, selected information. This was the first notice of the planned acquisition by Roku and the status of their DataXu securities—other than account statements—that Defendants or DataXu provided to Plaintiffs.

38.    On November 8, 2019, DataXu merged into Roku's wholly-owned merger subsidiary and Delaware corporation named Delaware Acquisition Company, Inc. ("DAC"), and DAC was renamed, "Roku DX Holdings, Inc." ("DX"). On information and belief, DX was actually named or renamed DataXu International ("DXI").

39.    Although DX or DXI is a different corporation from DataXu, DX continues filing as a foreign corporation in Massachusetts under the name, DataXu, Inc.

### DataXu securities

40.    DataXu was an "issuer" as defined in section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and section 3(a)(8) of the Exchange Act, 15 U.S.C. § 78c(a)(8).

41.    DataXu, as directed by Defendants, issued various securities, including call options, warrants, restricted stock units ("RSUs"), common stock with par value (CWP), preferred stock with par value (PWP), and convertible promissory notes. The options included employee stock options ("ESOs"), which included tax-qualified incentive stock options ("ISOs") and non-tax qualified stock options ("NSOs"), and the preferred stock included series A to F, as well as the series C-1 stock that was issued to Plaintiff Berlik (the "C-1 Plaintiff").

42.    DataXu, as directed by Defendants, issued (1) ESOs to the Employee Plaintiffs under an employee stock plan that Defendants had adopted in 2008 and used through 2019, and (2) "RSUs to certain Employee Plaintiffs, which were units (equaling a single share of common stock) entitling the holder to acquire shares of DataXu common stock or the cash equivalent upon the holder's continued employment by DataXu, or the attainment of one or more performance milestones.

43.   Defendants issued series C-1 preferred stock to Plaintiff Berlik, to which preferred stock Defendants attached fewer distribution and other preferences than to other series of preferred stock.

**DEFENDANTS' SCHEME INVOLVING SECURITIES AND CONTRIBUTION-SHIFTING DEVICES**

44.   Defendants devised and executed a scheme to maximize the return of or on capital that they contributed to DataXu by appropriating the value of Plaintiffs' contributions to themselves, including by: (1) marketing DataXu's "equity-participation" program(s) to obtain, retain, and motivate talented employees as a means of increasing DataXu's performance and value; (2) using DataXu securities as non-cash substitute compensation for cash compensation for employeesand, in Plaintiff Berlik's case, as non-cash consideration for the partial purchase price of Mexad ; (3) selling DataXu securities to employees at 409A valuation amounts that did not factor in the risks that the Contribution-Shifting Device(s) posed to common stock; and (4) concealing and failing to disclose, at the time sales were offered, investment decisions made, and purchases effected, the significant risk that Defendants could or would employ one or more Contribution-Shifting Devices to shift Plaintiffs' contributions to DataXu to themselves when Defendants decided to liquidate their investments (the "Contribution-Shifting Scheme").

45.   The Contribution-Shifting Scheme used at least three known Contribution-Shifting Devices: (1) a **deemed-liquidation device**, which Defendants first established in April 2009, by which Defendants could "legally treat" DataXu's sale or merger as a fictional liquidation and thereby employ an absolute priority distribution model, as used in bankruptcy, instead of a pari-passu (equal footing) model, as typically used in sales or mergers; (2) an **insider- loan device**, which Defendants created between 2017 and 2019, by which Defendants obligated DataXu to pay certain Defendants 2 to 3 times the total principal and interest (6% per year) due on convertible promissory notes issued in late 2017 and early 2019; and (3) a **retention-plan**

**device**, which Defendants created between 2018 and 2019, by which Defendants obligated DataXu to pay Defendants, including those who held a majority of DataXu common stock and one or more of DataXu's executive officers, $17.25 million, purportedly in exchange for "remaining" employed *with DataXu* for several months until the Merger Agreement and closing of the merger with Roku.

46.    As detailed below, the insider-loan device was implemented in order to ensure that those Defendants who had invested in Series A, B, and C preferred shares (each of which had also invested in Series D, E, and F preferred shares prior to implementation of the insider-loan device) would recover their entire investment in the three earliest rounds of preferred share investments, to the detriment of Plaintiffs.

47.    The **insider-loan device** and **retention-plan device** were corrupt, inside deals that constituted economic rents DataXu paid to Defendants at the expense of all Plaintiffs and those common shareholders who did not benefit from the retention-plan device.

### DEFENDANTS' CONCERN WITH PRIORITIZING *THEIR* PAYOUTS

48.    In *The VC Game*, Defendant Bussgang notes the venture capitalist's economic concern with the liquidation preference equation, which refers to the structure of pay-outs when venture-capital investors liquidate preferred stock (or other securities) issued by a portfolio (startup) company (the "pay-out structure").

49.    The payout structure includes: (1) the preference component, which concerns the return <u>of</u> contributed capital (or principal); and (2) the participation component, which concerns the return <u>on</u> contributed capital (or yield). (*The VC Game*, at 133). The preference component and corresponding algorithm concerns *return* of *capital contributed* and, according to Defendant Bussgang, ensures that "those *who have invested capital* get preference in any liquidation over

the other claim holders, e.g., common stockholders *who haven't invested capital*, but have a

stake in the company through their ownership of common stock." (*Id.* at 133-34) (emphasis

added).

50.   Preferred stockholders, Defendant Bussgang notes, can "seek more than simply 1x

their invested [contributed] capital . . . and demand a 2x or 3x liquidation preference." (*Id.* at

134).

51.   Defendant Bussgang's book notes that "[m]ost VCs invest in companies that need to

hire additional management team members, sales and marketing personnel, and technical talent

to build the business. . . . These new hires typically receive stock options . . . ." (*Id.* at 131).

52.   Providing compensation to employees in the form of options and restricted stock is

necessary to get well-qualified employees to join a startup company (which is riskier than joining

an established company), and is an incentive for such employees to join a company for lower

cash compensation, initially, and with the expectation of sharing in the company's future

success.

53.   Defendant Bussgang's *The VC Game* is silent on the question of the **counter-

incentive effect**, or *why* a pay-out structure that adversely affects the employee-security holders

does not neutralize the stock option pool's intended purpose of incentivizing prospective and

present employees

54.   The **counter-incentive effect** can be posed as the question: *Why* would prospective or

present employees who are aware of a pay-out structure adverse to their interests, nonetheless:

(1) accept ESOs as a partial substitute for cash compensation; (2) convert ESOs into the

corporation's common stock at the 409A "market value" of the common stock upon option

issuance, knowing that such valuation does not reflect or consider the pay-out structure; and (3)

assume a greater risk of loss of per dollar of investment capital than those who direct the corporation?

55.   Defendants knew, and/or were reckless in not knowing, that, if Defendants' Contribution-Shifting Devices had been disclosed, the ostensible cash-saving and incentive benefits that DataXu's equity-participation program(s) provided to Plaintiffs would have been neutralized.

56.   Defendants knew, and/or were reckless in not knowing, that, if they had disclosed the exit options and Contribution-Shifting Devices that Defendants had established and intended to use, and the risks that such Contribution-Shifting Devices posed to the value of Plaintiffs' DataXu securities, Plaintiffs would not have joined or remained with DataXu as employees, would have required greater cash compensation, and would not have contributed capital in the form of cash or an ongoing business (in the case of C-1 Plaintiff Berlik) to acquire DataXu securities.

57.   Defendants knew that they could avoid the **counter-incentive effect** either: (1) by *assuring employees* that DataXu and Defendants would not employ Contribution-Shifting Devices; or (2) by *not informing* employees and by *keeping employees ignorant* both of the existence of Contribution-Shifting Devices, Defendants' possible use of such devices, and the economic consequences such devices would have on the value of DataXu securities paid to or purchased by Plaintiffs.

58.   The DataXu Defendants elected to avoid the counter-incentive effect by concealing, and keeping Plaintiffs and other employees ignorant of: (1) the specific terms of the pay-out structure Defendants had created for themselves, at the expense of the employee security holders; (2) the existence and nature of the Contribution-Shifting Devices, especially including the

15

deemed-liquidation device, that would disproportionally shift any losses from the preferred

stockholders (*i.e.,* Defendants) to the capital stockholders and non-majority common

stockholders, including Plaintiffs, and the C-1 Plaintiff; and (3) the fact that prices Plaintiffs paid

for access to ESOs through lower salaries and paid in cash to acquire and exercise ESOs to

purchase DataXu common stock, or acceptance of C-1 preferred stock in exchange for a portion

of the value of Plaintiff Berlik's company, did not take into account any diminution of their

DataXu stock value through the Contribution-Shifting Devices.

59.    Defendants devised and executed a scheme, in which they concealed and did not

disclose to Plaintiffs the exit options they had established and intended to employ, or the risks

and adverse consequences to Plaintiffs of their use of any one or more of the Contribution-

Shifting Devices.

60.    Defendants concealed and did not provide to Plaintiffs copies of DataXu's (1)

certificate and articles of incorporation, either as filed originally, or as amended and restated

(five times); (2) bylaws or resolutions; or (3) financial statements.

61.    Defendants concealed and did not inform Plaintiffs, either before or after the

Corporation sold shares of DataXu securities to Plaintiffs, that they or their predecessors had set

up one or more Contribution-Shifting Devices and that they could or would, as they did, use such

devices if and when they sold or merged the Corporation.

62.    Defendants concealed and omitted information from the representations they made or

caused to be made to Plaintiffs to promote sales of DataXu securities to Plaintiffs and to induce

Plaintiffs to work for DataXu while foregoing additional compensation in exchange for options

on DataXu common stock or receipt of RSUs and cash payments to exercise such options and, in

the case of Plaintiff Berlik, to accept DataXu Series C-1 Preferred stock as partial consideration for his ownership share of Mexad.

63.    Defendants did not call and hold any annual meetings of stockholders, and on information and belief, Defendants elected directors of DataXu by written consent in lieu of an annual meeting of stockholders under Delaware General Corporation Law § 211(b).

64.    Plaintiffs had no knowledge of, or participation in, the creation of the deemed-liquidation device or other Contribution-Shifting Devices and did not learn of their availability or intended use prior to October 22, 2019.

65.    Plaintiffs did not know of these Contribution-Shifting Devices because Defendants concealed and failed to inform Plaintiffs of these devices when Plaintiffs made their decisions to purchase DataXu securities.

66.    Defendants concealed and never disclosed to Plaintiffs, that Defendants: (1) were interested *exclusively* in their economic outcomes and would use Contribution-Shifting Devices to benefit themselves at the expense of Plaintiffs; (2) would employ the deemed-liquidation device to insure that they received $X per dollar that Defendants contributed (X is a positive number) even if Plaintiffs received $0 per dollar that Plaintiffs contributed; (3) would employ the insider-loan device to increase some Defendants' return on capital; and (4) would employ the retention-plan device to obtain and ensure the cooperation of the majority shareholders of common stock, who otherwise would have received $0 per share of common stock under the other two devices.

67.    The economic harm to Plaintiffs from the scheme was realized on November 8, 2019, when DataXu equity securities were extinguished and Plaintiffs received $0 return of and on their invested capital.

## DEFENDANTS' ILLUSION OF EMPLOYEE EQUITY PARTICIPATION

68.    Defendants caused DataXu to create a stock option pool to incentivize its prospective and present employees. In his book, Defendant Bussgang discusses how venture capitalists, like himself and others of the Defendants, make a pre-money valuation of a startup company by considering the amount of capital sought, the percentage of ownership the venture capitalists seek, and the competition for the portfolio company. (*The VC Game*, at 130).

69.    Defendants knew and acted upon the general belief that that, as Defendant Bussgang notes, a startup company must hire additional management team members. (*Id.* at 131).

70.    Defendants knew, and/or were reckless in not knowing, that a group of talented employees are very important to the growth of a startup company, and that a stock option pool enables a startup company to obtain, retain, and motivate employees to increase its economic value because those employees expect to share in the upside potential of the company's value upon a successful sale or initial public offering.

71.    Defendants knew, and/or were reckless in not knowing, that employees were not advised that Defendants had enacted the deemed-liquidation contribution-shifting device, which allowed them to "deem" the sale a liquidation event, and thereby shift the usual distribution scheme to an absolute priority distribution model, as used in bankruptcy, instead of a pari-passu (equal footing) model, as used in most sales or mergers.

## DEFENDANTS' AUTHORIZED OFFERS AND SALES OF DATAXU SECURITIES TO PLAINTIFFS

72.    Defendants knowingly used DataXu securities: (1) to pay, in part, for ownership of a profitable German company, Mexad; (2) to entice employees to work for DataXu; (3) to compensate employees for becoming and remaining DataXu employees; and (4) to obtain

18

additional contributed capital from employees, in the form of cash paid for exercised stock options, or otherwise.

73.   In or around 2008, DataXu's Board of Directors ("BOD"), which included certain Defendants, adopted the 2008 Stock Option Plan ("2008 SO Plan"), which provided for the granting of qualified employee stock options, including ISOs and NSOs or other awards, such as RSUs, to DataXu employees.

74.   The 2008 SO Plan provided for the issuance and sales of up to 61,933,640 shares of DataXu common stock. Defendants authorized, ratified, and approved offers and sales of DataXu securities, including stock options, restricted stock units, common stock and preferred stock (Series C-1), to Plaintiffs, as non-cash compensation and for cash or in-kind value.

75.   DataXu granted ESOs, including ISOs, to employees as non-cash compensation. The ISOs vested over a four-year period of continued employment, with the first portion vested after one year and the remaining portions vested over the following three years.  The ESOs, if not exercised, terminated ten years from the date they were granted.

76.   According to DataXu, in July 2017, its BOD terminated the 2008 SO Plan, but on information and belief, Defendants continued to authorize DataXu to grant ESOs.

77.   When Defendants and agents of DataXu offered and sold DataXu securities to Plaintiffs for cash and other consideration, Defendants knew, and/or were reckless in not knowing, that DataXu and Defendants (1) had not disclosed to Plaintiffs the risks that Contribution-Shifting Devices posed to the value of the offered securities; (2) had not informed the firm performing the 409A valuation of the existence and risks that the Contribution-Shifting Devices posed to the value of DataXu common stock; (3) had misrepresented to Plaintiffs the

value of DataXu common stock and, (4) in the case of Plaintiff Berlik, had misrepresented the value of series C-1 preferred stock.

78.    When Defendants and agents of DataXu promoted, offered and sold DataXu securities to Plaintiffs for cash and other consideration, Defendants knew, and/or were reckless in not knowing, that Plaintiffs and others who purchased DataXu securities through cash and other consideration were unaware of, and did not know about, the risks that the deemed liquidation device and other Contribution-Shifting Devices posed to the value of the securities they purchased.

79.    Based on the information provided by Defendants, and Defendants' failure to conceal material information regarding the Contribution-Shifting Devices, Plaintiffs reasonably inferred that, upon DataXu's sale or disposition *other than through bankruptcy*, Plaintiffs would receive their proportionate share of the capital contributed. Plaintiffs further reasonably inferred that their capital would not be appropriated by those who controlled DataXu, based on their decisions regarding when and how to effect a sale or merger.

THE EXERCISE-OF-OPTIONS MEETING (JUN. 2015)

80.    On or about June 16, 2015, in a meeting with DataXu employees, Richard Forcier, then-secretary of DataXu, and Joel Abdinoor, then VicePresident of Finance, explained how to understand and calculate the value of DataXu shares held through the ESOs or RSUs ("ESO Meeting"). Forcier and Abidnoor acted as agents of Defendants in conveying this information.

81.    During the ESO Meeting, either Forcier or Abdinoor noted that the exercise price on DataXu stock options was the "fair market value" of DataXu common stock as determined under § 409A [of the Internal Revenue Code, 26 U.S.C. § 409A], and that two to three times per year, DataXu obtained a 409A valuation of its stock. Forcier noted that the last valuation date,

20

December 31, 2014, showed an exercise price for common stock of $0.71 per share, "an increase of the prior report of 34%."

82.    Either Forcier or Abidnoor also demonstrated how employees who exercised options would share in the upside of a sale or merger of DataXu. Specifically, the employees were told that, where (1) an employee buys 100,000 shares of DataXu common stock at the option exercise price of $0.53 per share for a total price of $53,000; (2) the Corporation sells its issued and outstanding common stock at $2 per share for a sales price of $360 million; and (3) the employee sells shares held for $200,000 ($2/share * 100,000 shares); (4) the employee would realize a net gain of $147,000 ($200,000 less $53,000).

83.    During the ESO Meeting, there was no reference to the deemed-liquidation device and its potential effect on exercised ESOs if DataXu did not go public and if the sale of DataXu did not reach an ever-increasing threshold sales price required merely for some return of the employees' contributed capital.

84.    In or about November 2015, Defendants rejected a purchase offer from Amobee, Inc., a cross-channel video advertising platform and a wholly owned subsidiary of Singtel, one of the largest communications technology companies in the world, to acquire DataXu for approximately $380 million.

THE SECURITIES PRESENTATION (DEC. 2016)

85.    On or about December 12, 2016, DataXu prepared and distributed a written presentation entitled "DataXu Employee Stock Options Overview," which discussed a DataXu ESO Plan.

86.    The Presentation: (1) provided information about the vesting of DataXu ESOs, including ISOs, which were qualified and tax advantaged, and NSOs, which were not qualified

and not tax advantaged; (2) noted that companies issued ESOs in order to attract and retain talented employees, to align the company's and employee's goals, and to compensate employees with non-cash compensation; (3) stated that DataXu options would vest over four years with a minimum employment of one year for any vesting (one-year cliff vesting), after which 25% of the total granted options (10,000) would vest, with the remaining 75% vesting over the following 36 months. The Presentation stated that "[o]nce options vest, [the] employee can purchase them at $0.50 per share, and it confirmed that the "Employee generally has to pay cash to exercise the option."

87.    The Presentation proposed, as an example, a scenario in which: (1) an employee buys 10,000 shares of DataXu common stock at the option exercise price of $0.50 per share for a total price of $5,000; (2) the Corporation goes public at $20 per share; and (3) the employee sells the 10,000 shares for $200,000 ($20 per share * 10,000 shares), realizing a net gain of $195,000 $200,000 less $5,000. Although not stated as such, the example showed a return *of* the employee's contributed capital of $5,000 and a return *on* the contributed capita of 3,900%.

88.    The Presentation made no mention of: (1) the deemed-liquidation device or any other contribution-shifting device that Defendants could use; (2) the effect such device(s) would have on the value of DataXu common stock *if DataXu did not have an IPO*; or (3) the threshold selling price of DataXu necessary to provide (i) a return to the common stockholder of the cash contributed to purchase each share of DataXu common stock or a return to the C-1 Plaintiff of the value he exchanged for his shares of C-1 preferred stock or (ii) required to provide any capital gain per share of common stock or C-1 preferred stock.

89.    Concerning the economic value of the DataXu common stock, the Presentation disclosed that: (1) the DataXu "shares are illiquid—meaning it [*sic*] can not [*sic*] be bought/sold

in the public market"; (2) a third party provides fair market value under section 409A of the

Internal Revenue Code [26 U.S.C. § 409A]; and (3) the "[l]iquidity [of the shares] generally

requires an IPO or a sale of the company."

90.    Concerning the economic value of the DataXu common stock, the Presentation did not

disclose that one or more Contribution-Shifting Devices significantly diminished the value,

perhaps to $0 per share (as the case turned out to be), in the event that DataXu did not conduct an

IPO or sell at a significantly high price.

91.    Defendants did not provide DataXu's certificate of incorporation or bylaws to

Plaintiffs during the above meetings and presentations or at any other time, and Plaintiffs never

had access to these documents.

### DEFENDANTS SOLD COMMON STOCK TO PLAINTIFFS

92.    From no later than 2008 to before November 8, 2019, DataXu's BOD and Defendants

approved: (1) grants of common stock options to DataXu employees as compensation, subject to

vesting, exercisable at various prices; (2) sales of shares of DataXu common stock to DataXu

employees; and (3) sales of shares of DataXu common stock at a 409A exercise price that did not

account for effect that the deemed liquidation device would have on the value of shares of

DataXu common stock.

### 409A VALUATIONS AND SOLIUM CAPITAL, INC.

93.    Because DataXu planned to issue and issued deferred (non-cash) compensation to

DataXu employees in the form of employee stock options, and because DataXu did not want the

Internal Revenue Service to assess penalties against DataXu employee-shareholders, Defendants

had DataXu conduct 409A valuations of DataXu's common stock as per 26 U.S.C. § 409A.

94.    A "409A valuation" is the appraised fair market value that an independent valuation provider assigns to each share of a private company's common stock, and was the price that DataXu employees, including Employee Plaintiffs, paid in exercising an ESO to purchase a share of common stock.

95.    Defendants engaged Solium Capital ULC (now, together with its affiliates, doing business as Shareworks, hereafter, "Shareworks") as an independent valuation provider to conduct 409A valuations every twelve (12) months, or upon a material event, and to send to Employee Plaintiffs account statements showing such valuations.

96.    The 409A valuations of DataXu common stock were used to determine the option exercise (strike) price Employee Plaintiffs paid to exercise their ESOs.

97.    On information and belief, Defendants did not inform Shareworks or any other retained, independent valuation provider of the Contribution-Shifting Devices they had set up or intended to set up to use in assessing the value of DataXu's common stock.

98.    The 409A valuations of each share of DataXu's common stock did not discount such shares to reflect the risks of the use of the deemed-liquidation device or any other Contribution-Shifting Devices.

99.    Defendants knew, and/or were reckless in not knowing, that the 409A valuations of DataXu common stock were based on materially incomplete information and were, therefore, overstated and illusory.

### DATAXU'S USE OF RULE 701 (SECURITIES ACT)

100.   DataXu did not register any of the securities transferred to Plaintiffs.

101.   On information and belief, Defendants considered the issuance of ESOs, ISOs, and stock issuances upon exercise of vested ISOs to be transactions exempted from registration under

Rule 701, promulgated in 1988 under the Securities Act of 1933, and codified at 17 C.F.R. § 230.701 ("Rule 701").

102.  Specifically, Rule 701(c) "exempts offers and sales of securities (including plan interests and guarantees pursuant to paragraph (d)(2)(ii) of this section) under a written compensatory benefit plan (or written compensation contract) established by the issuer for the participation of their employees, directors, general partners, trustees (where the issuer is a business trust), officers, or consultants and advisors, and their family members who acquire such securities from such persons through gifts or domestic relations orders" subject to aggregate sales amounts.

103.  Rule 701(e) requires that the issuer deliver to the investor a copy of the compensatory benefit plan or contract.

104.  Rule 701 provides, among other things, that if the aggregate sales price or amount of securities sold during any consecutive 12-month period exceeds $10 million, the issuer must deliver the following disclosure to investors a reasonable period of time before the date of sale: (1) a summary plan description; (2) information about the risks associated with investment in the securities sold pursuant to the compensatory benefit plan or compensation contract; and (3) financial statements required to be furnished by Part F/S of Form 1-A (Regulation Offering Statement).

105.  Rule 701 does not exempt transactions from the antifraud, civil liability, or other provisions of the federal securities laws.

### PLAINTIFFS PURCHASED DATAXU SECURITIES

106.  The below tables show Plaintiffs' purchases of DataXu securities, mostly capital stock, from Defendants and DataXu:

| Date Acquired | Name of buyer Last | First | Total shares | Price per share | | Total paid |
|---|---|---|---|---|---|---|
| **Series C-1 preferred stock** | | | | | | |
| 01/01/13 | Berlik | Sacha | 1,127,076 | $ | 1.2297 | $ 1,385,999.92 |
| 01/01/14 | Berlik | Sacha | 1,127,076 | $ | 1.2297 | 1,385,999.92 |
| 01/01/15 | Berlik | Sacha | 1,127,076 | $ | 1.2297 | 1,385,999.92 |
| | **Subtotal** | | **3,381,229** | | | $ **4,157,999.75** |
| **Common stock** | | | | | | |
| 06/07/10 | Lobdell | C.P. | 40,000 | $ | 0.1000 | $ 4,000.00 |
| 07/21/11 | Lobdell | C.P. | 110,000 | | 0.3200 | 35,200.00 |
| 00/00/11 | Walton | Laura | 14,063 | | 0.3200 | 4,500.16 |
| 00/00/12 | Keats | Shane | 132,396 | | 0.3332 | 44,114.35 |
| 03/15/12 | Dean | Paul | 3,125 | | 0.4000 | 1,250.00 |
| 05/17/12 | Heuemueller | Jan | 39,167 | | 0.4000 | 15,666.80 |
| 04/04/13 | Heuemueller | Jan | 16,667 | | 0.4000 | 6,666.80 |
| 08/21/13 | Block | Berit | 25,000 | | 0.4000 | 10,000.00 |
| 08/21/13 | Lobdell | C.P. | 27,500 | | 0.4000 | 11,000.00 |
| 02/14/14 | Lobdell | C.P. | 80,000 | | 0.4500 | 36,000.00 |
| 10/23/14 | Block | Berit | 7,500 | | 0.5300 | 3,975.00 |
| 10/23/14 | Dean | Paul | 990 | | 0.5300 | 524.70 |
| 10/23/14 | Heuemueller | Jan | 14,583 | | 0.5300 | 7,728.99 |
| 10/23/14 | Lobdell | C.P. | 7,812 | | 0.5300 | 4,140.36 |
| 03/31/15 | Heuemueller | Jan | 18,750 | | 0.7100 | 13,312.50 |
| 06/19/15 | Dean | Paul | 364 | | 0.5300 | 192.92 |
| 06/19/15 | Dean | Paul | 21,875 | | 0.4000 | 8,750.00 |
| 03/28/16 | Goldberg | Jennifer | 15,292 | | 0.6300 | 9,633.96 |
| 03/00/18 | Le May | Chris | 27,380 | | 0.4044 | 11,071.10 |
| | **Subtotal** | | **602,464** | | | $ **227,727.64** |
| | **Total** | | **3,983,693** | | | $ **4,385,727.39** |

107.  In exercising their vested ISOs and buying shares of DataXu common stock at the option-exercise or strike price, DataXu employees were required to sign the following statements acknowledging certain risks: (1) "I understand that the Shares have not been registered under the Securities Act of 1933, as amended, or any state securities laws," and (2) "I must continue to bear the *economic risk* of the investment for an indefinite time and that the Shares cannot be sold

unless they are subsequently registered or an exemption from registration is available" (emphasis added).

108.  The "economic risk of the investment" did not include the risk that Defendants had created and would use Contribution-Shifting Devices that created a different risk, namely, corporate-assets distribution risk.

109.  Defendants and DataXu never declared a dividend for holders of its common stock and never distributed funds to Plaintiffs.

**DEFENDANTS USED PREFERRED STOCK AS PARTIAL PAYMENT (2011-2015)**

110.  Defendants had set up the deemed-liquidation device, or one iteration of it, by December 2011.

111.  On or about December 21, 2011, DataXu entered into an agreement to purchase all of the outstanding capital stock of Mexad LTD ("Mexad"), a Germany-based technology and service provider of auction-based ad impressions over digital auction platforms, from stockholder owners Sacha Berlik, Oliver Jung, Miccron Investments Limited, Degebu GmbH, and ONE2CUBE GmbH (the "Mexad Purchase Agreement").

112.  Under the Mexad Purchase Agreement, DataXu paid non-contingent and contingent consideration, with the non-contingent consideration the payment of €10,080,000 in cash, while the contingent or earn-out consideration required Mexad's satisfaction of earn-out thresholds and the exercise of a resulting call option, in the form of DataXu preferred stock.

113.  The Mexad Purchase Agreement noted that DataXu had recently issued shares of Series C preferred stock to investors at a post-money valuation of $145 million (the "Series C Post-Money Valuation") and was not in the process of a financing round at a valuation below the Series C Post-Money Valuation.

114.  Defendants did not inform Plaintiff Berlik of the deemed-liquidation device and the risks and consequences its use posed to Berlik's equity compensation for Mexad before (or after) the Mexad purchase.

115.  Defendants did not inform Plaintiff Berlik of other exit options and Contribution-Shifting Devices that they could employ, as they did, in order to capture the value they purportedly paid Plaintiff Berlik by means of Series C-1 preferred stock.

116.  If Defendants had informed Plaintiff Berlik of the deemed-liquidation device and their possible use of that device and other Contribution-Shifting Devices, Plaintiff Berlik: (1) would not have sold or agreed to sell Mexad to DataXu; and (2) would not have accepted shares of DataXu preferred stock in lieu of cash.

117.  In late 2011 or early 2012, DataXu closed on the Mexad Purchase Agreement.

118.  On or about January 9, 2012, Plaintiff Berlik received as partial consideration for his ownership share in Mexad the right to shares of C-1 preferred DataXu stock as "earn-out consideration shares" in an amount to be determined pursuant to Schedule 3 annexed to the Mexad Purchase Agreement, entitled "Earn-Out Provisions" ("Earn-Out Schedule").

119.  On information and belief, Plaintiff Berlik was the only holder of Series C-1 preferred stock and the C-1 series was created expressly as partial consideration for the purchase of Plaintiff Berlik's ownership share of Mexad.

120.  By letter dated April 30, 2012, Defendant Baker, DataXu's CEO, notified Plaintiff Berlik that DataXu's 2011 adjusted EBITDA shown in the earn-out accounts exceeded €1,000,000 and that the 2011 earn-out consideration was €1,100,000.

121.  By letter dated March 28, 2013, Defendant Baker notified Plaintiff Berlik that DataXu's 2012 adjusted EBITDA shown in the earn-out accounts was €2,188,234 and that the 2012 earn-out consideration was €2,188,234.

122.  The maximum aggregate earn-out consideration, according to the Mexad Purchase Agreement, was €3,080,000. Because the total calculated consideration was €3,288,234, the total earn-out consideration payable to Plaintiff Berlik was €3,080,000.

123.  Pursuant to the Earn-Out Schedule, the earn-out consideration was to be satisfied through payment to Plaintiff Berlik of an aggregate number of earn-out consideration shares having an aggregate original issue price equal to the amount of the earn-out consideration. For the purpose of calculation, the conversion rate between US dollars and Euros was set at "EUR 1 = USD 1.35." Thus, Plaintiff Berlik was entitled to C-1 Preferred shares valued at US$ 4,158,000.

124.  Pursuant to the Mexad Purchase Agreement, Plaintiff Berlik was entitled to be vested in the amount of earn-out consideration shares, C-1 Preferred shares, equivalent to US$ 4,158,000, in three equal installments, on January 1, 2013, January 1, 2014, and January 1, 2015. The Mexad Purchase Agreement defined the original issue price of each C-1 Preferred share as US$ 1.2297303 per share. Accordingly, the total earn-out consideration of US$ 4,158,000 payable to Plaintiff Berlik converted into 3,381,229 C-1 Preferred shares.

125.  No later than January 1, 2015, Plaintiff Berlik had a vested right to 3,381,229 shares of C-1 preferred stock in partial payment for his ownership share in Mexad as "Earn-Out Consideration Shares."

126.  Upon a "deemed liquidation event" under DataXu's Amended and Restated Certificate of Incorporation, which included an IPO, or sale of DataXu, Plaintiff Berlik had a right to have

the Earn-Out Consideration Shares issued to him. Defendants never gave him a copy of the then-current or any subsequent Amended and Restated Certificate of Incorporation of the Company, nor did the Mexad Purchase Agreement provide any explanation of what might constitute a "deemed liquidation event" or any potential consequences for Plaintiff Berlik's vested C-1 Preferred stock.

127.  On January 16, 2015, after the completion of the vesting period for the total earn-out consideration, Plaintiff Berlik left DataXu's employ.

128.  During calendar year 2016, all eligible Mexad employees exercised their rights for a cash payout, which resulted in DataXu making total cash payments of $546,000 ($509,000 was charged as additional paid-in capital and $37,000 was charged to stock-based compensation expense).

### DEFENDANTS SET UP DEEMED-LIQUIDATION DEVICE (2009)

129.  On information and belief, Defendants amended and restated DataXu's certificate of incorporation several times for the purpose, among others, of setting up the contribution-shifting device that is here characterized as the deemed-liquidation device.

130.  On information and belief, Defendants amended and restated DataXu's certificate of incorporation including the adoption of the deemed-liquidation device to accommodate a new round of equity (preferred-stock) financing. DataXu's 2015 Certificate contains a section entitled "Deemed Liquidation Events," which purports to purports to transform Event R, a sale and merger, into Event F, a liquidation, by dint of declaration.

131.  Sections 2.1.1 and 2.1.2 of the 2015 Certificate provided at least four tiers of payout of contributed capital out of the assets of the Corporation—"the waterfall"—available for distribution to stockholders:

a.   Under § 2.1.1, holders of Series D, E, and F preferred stock received up to the original issue price per share for the applicable series.

b.   Under § 2.1.2, which applied if the first set of preferred shareholders received full refund of their contributed capital, holders of Series A, B, C preferred stock received up to the full original issue price for the applicable series.

c.   Under § 2.1.2, holders of C-1 preferred stock, Plaintiff Berlik, would receive up to the original issue price per share only after the other six series—held by insiders—had recovered their full capital contributions to DataXu.

d.   Finally, under § 2.2, entitled "Remaining Amounts," the Certificate provided that "after the full payment of all preferential amounts required to be paid to the holders of shares of Preferred stock pursuant to Section 2.1, the remaining assets of the Corporation, if any, available for distribution to its stockholders shall be distributed among the holders of Common Stock, pro rata based on the number of shares held by each such holder."

132.  With respect to voting, the 2015 Certificate provided in § 3.1, that "each holder of outstanding shares of Preferred stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred stock" are "convertible as of the record date for determining stockholders entitled to vote on such matter."

133.  The 2015 Certificate's voting rights ensured that the owners of Preferred Stock, other than the owners of C-1 Preferred Stock, exercised actual control over the Company through their rights to elect a majority of DataXu's Directors.

134.  By 2015, the Directors were: two Directors named by owners of Series A Preferred Stock, one Director named by owners of Series B Preferred Stock, and one Director named by

31

owners of Series D Preferred Stock. Upon information and belief, earlier Amended and Restated Certificates of Incorporation included similar voting provisions in order to ensure control of DataXu by the owners of Preferred Stock (but not C-1 Preferred Stock).

135.  On information and belief, the Amended and Restated Certificate of Incorporation for the Corporation that was filed with the Secretary of State of the State of Delaware on April 3, 2009, contained the same deemed-liquidation device that appears in the 2015 Certificate, which was intended to accommodate the venture capital and other entity investments into DataXu.

136.  The deemed-liquidation device was used, in fact, to determine the amounts of Director Distributions paid out upon the closing of the sale of DataXu to Roku, as described below.

137.  Implementation of the deemed-liquidation device made the Director Distributions higher than they would have been without implementation.

### OPERATION OF THE DEEMED LIQUIDATION DEVICE

138.  The deemed-liquidation device is a fictive mechanism that executes the preferences in the pay-out structure to ensure that insiders, including venture capitalist-directors, are able to "shift" the non-insiders' capital contributions in the form of cash, business enterprises, and efforts to themselves, and thereby:

    a.    Provides insiders a greater return of per dollar contributed than non-insiders; and

    b.    Exposes non-insiders to greater business risk, for if the corporation is not "sufficiently" successful, they lose a greater proportion of their capital contribution dollar.

139.  The deemed-liquidation device "transforms" a sale or merger (the actual event) into a fictional liquidation (the fictional event).

140.   The default rule on the sale of a corporation is the doctrine of pari passu (equal footing), meaning that each capital stockholder receives the same percentage of returned capital and return on capital.

141.   The default rule on the liquidation of a corporation is the doctrine of absolute preference.

142.   The state of Delaware authorized DataXu to issue two forms of capital stock: common stock and preferred stock, and DataXu issued both forms of stock.

143.   "Preferred," as a modifier of a corporation's term capital stock, can refer to one or more types of "preferences" over a corporation's "common" stock, including dividend preferences, distribution preferences, and voting preferences.

144.   DataXu issued its preferred stock in series, with each series identified by an alphabetic character beginning with A and proceeding through the alphabet. DataXu issued the following series of preferred stock: A, B, C, C-1, D, E, and F.

145.   From 2009 to August 2016, Defendants and DataXu conducted six (6) equity-financing rounds, with a new series of preferred stock issued in exchange for cash for each series of new preferred stock. On information and belief, DataXu had two debt-financing rounds, in March 2017 and March 2019.

146.   On or after October 22, 2019, in connection with Defendants' decision to sell Dataxu to Roku, Plaintiffs received from counsel representing DataXu the below table ("Director Table") that purports to show (1) the capital contributions, presumably in cash, to DataXu that Defendants Bussgang, Fagnan, Jarve, and Butler, and their respective affiliated funds or other entities, each made per equity-financing round (pay-ins) and debt-financing round(s) and (2) the anticipated distributions, in cash and Roku common stock, to each of the same Defendants and

their affiliated funds or entities ("Director Distributions"). A true and accurate copy of the

Director Table is reproduced below:

Certain of Dataxu's directors hold shares of Company Capital Stock, and several of Dataxu's directors are affiliated with venture capital funds or other entities that hold shares of Company Capital Stock or Notes of Dataxu, and therefore may have a personal beneficial interest in such shares. These shares and Notes will be converted into the right to receive Merger Consideration pursuant to the terms of the Merger Agreement. The following table sets forth, for each Dataxu director, the aggregate number of shares of Company Capital Stock and Notes held by such director and by all entities affiliated with such director.

[See Table Below]

| Director | Affiliated Stockholders | Aggregate Shares of Series A Preferred Stock Held | Aggregate Shares of Series B Preferred Stock Held | Aggregate Shares of Series C Preferred Stock Held | Aggregate Shares of Series D Preferred Stock Held | Aggregate Shares of Series E Preferred Stock Held | Aggregate Shares of Series F Preferred Stock Held | Aggregate Principal Amount of Convertible Promissory Note | Anticipated Proceeds at Closing* |
|---|---|---|---|---|---|---|---|---|---|
| Jeffrey Bussgang | Flybridge Capital Partners III, L.P.; Flybridge Network Fund III, L.P. | 14,285,714 | 3,990,912 | 4,065,933 | 1,824,901 | 1,348,435 | 627,455 | $750,000 | $3,257,743 and 63,443 shares of Roku Class A Common Stock |
| Donald Butler | Thomvest Ventures Ltd.; Thomvest Venture Capital SRL | 0 | 0 | 0 | 9,124,513 | 1,348,435 | 1,505,892 | $2,250,000 | $7,627,742 and 148,547 shares of Roku Class A Common Stock |
| Jeffrey Fagnan | Atlas Venture Fund VIII, L.P.; Accomplice Fund I, L.P.; Accomplice Fund II, L.P. | 14,285,715 | 3,990,912 | 4,065,933 | 2,129,053 | 1,348,435 | 1,003,928 | $3,000,000 | $5,512,224 and 107,348 shares of Roku Class A Common Stock |
| John Jarve | Menlo Ventures X, L.P.; Menlo Entrepreneurs Fund X, L.P.; MMEF X, L.P. | 0 | 13,968,193 | 8,131,866 | 3,041,503 | 1,348,435 | 1,505,892 | $3,000,000 | $6,751,327 and 131,479 shares of Roku Class A Common Stock |

*Before deduction for Escrow Funds, Stockholder Representative Fund and contribution.

## DEFENDANTS' FINANCING OF DATAXU

147.  DataXu financed its investments and operations by: (1) selling one or more debt

instruments in 2009 for cash proceeds totaling $1.6 million; (2) selling six series of DataXu

preferred stock—series A, B, C, D, E, and F—from 2009 to 2015; (3) selling debt, including convertible notes in 2017 and 2019; (4) selling shares of common stock to Plaintiffs; (5) using shares of preferred stock—series C-1—as partial consideration for Plaintiff Berlik's company, Mexad; and (6) using one or more credit facilities.

148. The six equity-financing rounds and two debt-financing rounds provided DataXu with approximately $86.6 million to $87.5 million in cash proceeds.

149. DataXu filed five Forms D with the Securities and Exchange Commission ("SEC"), the first concerning the 2009 sale of debt for $1.6 million, and the other four concerning separate or combined equity-financing rounds.

150. DataXu never filed a registration statement for securities that it offered and sold, including the sales of DataXu securities to Plaintiffs.

151. DataXu never had a secondary market into which one could enter to sell or buy existing DataXu securities.

**D<small>ATA</small>X<small>U</small>'<small>S</small> <small>DEBT PLACEMENT OF</small> $1.6 <small>MILLION</small> (S<small>EP.</small> 2007)**

152. On March 27, 2009, DataXu filed its first Form D with the SEC, which Defendant Baker signed and dated March 12, 2009 ("Form D-1").

153. Form D-1, filed as a "New Notice," shows a total offering amount of $1,600,000 in debt securities, twenty-three (23) investors, with the first sale having occurred on September 28, 2007, and a total of $1,575,000 already sold, leaving $25,000 remaining to be sold.

154. In August 2009, a line of credit with a financial institution enabled DataXu to issue a warrant to purchase up to 285,714 shares of Series A preferred stock.

155. In 2016, the warrants were exercised through a cashless transaction based upon a Series A preferred stock fair value of $1.25 and an exercise price of $0.21 per share.

156.   Upon exercise, the estimated fair value of the warrants was $148,571, which was converted into 118,857 shares of Series A Preferred stock.

**Round A: $6 million for Series A preferred stock (Apr. 2009)**

157.   On April 3, 2009, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware, a document not publicly available.

158.   On April 15, 2009, DataXu filed its second Form D with the SEC, which Defendant Baker signed as "President and Chief Executive Officer" and dated April 14, 2009 ("Form D-2").

159.   Form D-2, filed as a "New Notice," shows a total offering amount of $6,060,000 in equity securities, with the first sale having occurred on April 3, 2009, and a total of $6,060,000 already sold, leaving $0 remaining to be sold.

160.   According to the Director Table, Form D-2 referred to DataXu's Series A preferred stock.

161.   In April 2009, noteholders converted the notes payable into Series A preferred stock; DataXu issued warrants to purchase shares of Series A preferred stock valued at $1.17 per share at an exercise price of $0.21 per share. Upon exercise, the estimated fair value of the warrants was $1,111, which was converted into 949,261 shares of Series A Preferred stock. Warrants to purchase 119,046 shares with a fair value of $114 were exercised for net proceeds of $25 million. There were no warrants outstanding as of December 31, 2017.

162.   On information and belief, all of the $1.6 million in debt was converted into Series A preferred stock.

163.   According to the Director Table, Defendant Bussgang (for Flybridge Capital Partners) and Defendant Fagnan (for Atlas Venture) each purchased 14,285,714 shares of Series A

preferred stock at $0.21 per share for a price of $3 million each and a combined capital contribution to DataXu of $6 million.

164.  On information and belief, among the rights provided to holders of DataXu Series A preferred stock was the right to appoint directors to DataXu's BOD.

165.  Defendant Bussgang, who was a general partner with Flybridge Capital Partners, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Flybridge Capital Partners and to ensure the maximum return to that partnership's investment in DataXu through its funds, Flybridge Capital Partners III, L.P. and Flybridge Network Fund III, L.P.

166.  Defendant Fagnan, who was a partner with Atlas Venture, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Atlas Venture and to ensure the maximum return to that partnership's investment in DataXu through its fund, Atlas Venture Fund VIII, L.P.

**August 2009 Amended and Restated Certificate of Incorporation**

167.  On August 18, 2009, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware, a document not publicly available.

168.  On information and belief, Defendants inserted the "deemed-liquidation" language and device into the Amended and Restated Certificate of Incorporation for the Corporation filed with the Secretary of State of the State of Delaware on or about August 18, 2009.

169.  In August 2009, in connection with the issuance of a line of credit with a financial institution, the Corporation issued a warrant to purchase up to 285,714 shares of Series A Preferred stock. The warrant was immediately exercisable upon borrowings made on the line of credit, as defined, which did not occur. In 2016, the warrants were exercised through a cashless transaction based upon a Series A Preferred stock fair value of $1.25 and an exercise price of $0.21 per share. Upon exercise, the estimated fair value of the warrants was $148,571, which was converted into 118,857 shares of Series A Preferred stock.

### Round B: $11 million for Series B preferred stock (Mar. 2010)

170.  On March 3, 2010, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware, a document not publicly available.

171.  On March 19, 2010, DataXu filed its third Form D, which Curtis Mo, Secretary, signed and dated March 19, 2010 ("Form D-3").

172.  Form D-3, filed as a "New Notice," shows a total offering amount of $11,000,000 in equity securities, with the first sale having occurred on March 4, 2010, and a total of $11,000,000 already sold, leaving $0 remaining to be sold.

173.  On information and belief, Form D-3 concerns DataXu's Series B preferred stock.

174.  According to the Director Table, Bussgang (of Flybridge Capital Partners) and Fagnan (of Atlas Venture) each purchased 3,990,912 shares of Series B Preferred stock at $0.50 per share for a price of $2 million each and a combined capital contribution to DataXu of $4 million; Defendant Jarve (of Menlo Ventures) purchased 13,968,193 shares of Series B Preferred stock at $0.50 per share for a price of $7 million. Form D-3 concerns these purchases.

175.  On information and belief, among the rights provided to holders of DataXu Series B preferred stock was the right to appoint directors to DataXu's BOD.

176.  Defendant Bussgang, who was a general partner with Defendant Flybridge Capital Partners, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Flybridge Capital Partners and to ensure the maximum return to that partnership's investment in DataXu through its funds, Flybridge Capital Partners III, L.P. and Flybridge Network Fund III, L.P.

177.  Defendant Fagnan, who was a partner with Defendant Atlas Venture, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Atlas Venture and to ensure the maximum return to that partnership's investment in DataXu through its fund, Atlas Venture Fund VIII, L.P.

178.  Defendant Jarve, who was a partner with Defendant Menlo Ventures, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Atlas Venture and to ensure the maximum return to that partnership's investment in DataXu through its funds, Menlo Ventures X, L.P.; Menlo Entrepreneurs Fund X,, L.P.; and MMEF X, L.P.

**2011 and 2012 Amended and Restated Certificates of Incorporation**

179.  On February 4, 2011, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware, a document not publicly available.

180.  On March 30, 2012, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware, a document not publicly available.

**Round C: $20 million in DataXu Series C preferred stock (Mar. 2013)**

181.  On January 25, 2013, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware, a document not publicly available.

182.  On March 5, 2013, DataXu filed its fourth Form D with the SEC, which Defendant Michael Baker signed as "President" and dated March 5, 2013 ("Form D-4").

183.  On information and belief, Form D-4 referred to DataXu's Series C preferred stock.

184.  Form D-4, filed as a "New Notice," showed a total offering amount of $29,999,990 in equity securities, eight investors, and the first sale having occurred on January 1, 2013, with $26,999,991 already sold, leaving $2,999,999 to be sold.

185.  According to the Director Table, Defendant Bussgang (for Defendant Flybridge Capital Partners) and Defendant Fagnan (for Defendant Atlas Venture) each purchased 4,065,933 shares of Series C preferred stock at about $1.23 per share for capital contributions of $5 million each and a combined total of $10 million; Defendant Jarve (for Defendant Menlo Ventures) purchased 8,131,866 shares of Series C Preferred stock at about 1.23 per share for a price of $10 million. Form D-4 concerns these purchases.

186.  If Form D-4 is true and accurate, on information and belief the remaining $10 million consists of: (1) Series C-1 preferred stock issued to Plaintiff Berlik as payment-in-kind for about $3.6 million; (2) Series C preferred stock issued to 24 other individuals for about $3.4 million, and unsold Series C preferred stock of about $3, as Form D-4 reported.

187.  The Series C-1 preferred stock that Plaintiff Berlik held vested rights in did not provide its holders with the right to appoint a director to DataXu's BOD.

188.  On information and belief, among the rights provided to holders of DataXu Series C preferred stock was the right to appoint directors to DataXu's BOD.

189.  Defendant Bussgang, who was a general partner with Defendant Flybridge Capital Partners, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Flybridge Capital Partners and to ensure the maximum return to that partnership's investment in DataXu through its funds, Flybridge Capital Partners III, L.P. and Flybridge Network Fund III, L.P.

190.  Defendant Fagnan, who was a partner with Defendant Atlas Venture, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Atlas Venture and to ensure the maximum return to that partnership's investment in DataXu through its fund, Atlas Venture Fund VIII, L.P.

191.  Defendant Jarve, who was a partner with Defendant Menlo Ventures, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Menlo Ventures and to ensure the maximum return to that partnership's investment in DataXu through its funds, Menlo Ventures X, L.P., Menlo Entrepreneurs Fund X,, L.P.; and MMEF X, L.P.

192.  The chart below represents DataXu's information that Plaintiffs could obtain concerning capital contributions of Defendants (including affiliates) in Rounds A, B, and C, and represents Series A, B, and C preferred stock:

| Date Acquired | Name of Director / Buyer Last | First | Total shares | Price per share | Total paid |
|---|---|---|---|---|---|
| **Series A preferred stock** | | | | | |
| 04/00/09 | Bussgang | Jeffrey | 14,285,714 | 0.2100 | 3,000,000.01 |
| 04/00/09 | Fagnan | Jeffrey | 14,285,714 | 0.2100 | 3,000,000.01 |
| | **Subtotal** | | **28,571,428** | | **$   6,000,000.02** |
| **Series B preferred stock** | | | | | |
| 03/00/10 | Bussgang | Jeffrey | 3,990,912 | 0.5011 | 2,000,000.05 |
| 03/00/10 | Fagnan | Jeffrey | 3,990,912 | 0.5011 | 2,000,000.05 |
| 03/00/10 | Jarve | John | 13,968,193 | 0.5011 | 7,000,000.68 |
| | **Subtotal** | | **21,950,017** | | **$  11,000,000.79** |
| **Series C preferred stock** | | | | | |
| 03/00/13 | Bussgang | Jeffrey | 4,065,933 | 1.2297 | 5,000,001.01 |
| 03/00/13 | Fagnan | Jeffrey | 4,065,933 | 1.2297 | 5,000,001.01 |
| 03/00/13 | Jarve | John | 8,131,866 | 1.2297 | 10,000,002.02 |
| | **Subtotal** | | **16,263,732** | | **$  20,000,004.03** |
| 01/01/15 | Berlik | Sacha | 3,381,229 $ | 1.2297 | 4,157,999.75 |
| Various | Others (x24) | | 1,497,890 | 1.2297 | 1,842,001.25 |
| N/A | Unsold | | 2,439,558 | 1.2297 | 2,999,999.00 |
| | **Total** | | **23,582,410** | | **$  29,999,999.00** |

**Round D: $10.6 or $30 million in DataXu Series D preferred stock (Feb. 2014)**

193.  On January 21, 2014, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware, a document not publicly available.

194.  On February 5, 2014, DataXu filed its fifth and final Form D with the SEC, which Defendant Michael Baker signed as "President" and dated February 4, 2014 ("Form D-5").

195.  Form D-5, filed as a "New Notice," showed a total offering amount of $10,556,200 in equity securities, seven investors, and the first sale having occurred on January 21, 2014, with $9,999,999 already sold, leaving $556,201 to be sold.

196.  On information and belief, Form D-5 concerns DataXu's Series D preferred stock.

197.  According to the Director Table and other DataXu documentation:

      a.    Defendants Bussgang (for Defendant Flybridge Capital Partners) and Fagnan (for Defendant Atlas Venture) each purchased 1,824,901 shares of Series D preferred stock at about $1.64 per share for capital contributions of $3 million each and a combined total of $6 million;

      b.    Defendant Jarve (for Defendant Menlo Ventures) purchased 3,041,503 shares of Series D preferred stock, at about $1.64 per share, for a price of $5 million.

      c.    Defendant Butler (for Defendant Thomvest Ventures) purchased 9,124,513 shares of Series D preferred stock at about $1.64 per share for a price of $15 million.

      d.    Defendants Bussgang, Fagnan, Jarve, and Butler's purchases totaled $26 million.

198.  On information and belief, among the rights provided to holders of DataXu Series D preferred stock was the right to appoint directors to DataXu's BOD.

199.  Defendant Bussgang, who was a general partner with Defendant Flybridge Capital Partners, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Flybridge Capital

Partners and to ensure the maximum return to that partnership's investment in DataXu through its funds, Flybridge Capital Partners III, L.P. and Flybridge Network Fund III, L.P.

200.  Defendant Fagnan, who was a partner with Defendant Atlas Venture, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Atlas Venture and to ensure the maximum return to that partnership's investment in DataXu through its fund, Atlas Venture Fund VIII, L.P.

201.  Defendant Jarve, who was a partner with Defendant Menlo Ventures, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Menlo Ventures and to ensure the maximum return to that partnership's investment in DataXu through its funds, Menlo Ventures X, L.P., Menlo Entrepreneurs Fund X,, L.P.; and MMEF X, L.P.

202.  Defendant Butler, who was a managing director with Defendant Thomvest Ventures, was appointed by his firm to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Thomvest Ventures and to ensure the maximum return to that firm's investment in DataXu through its funds, Thomvest Ventures Ltd. and Thomvest Venture Capital SRL.

**<u>Round E: $26 million in DataXu Series E preferred stock (Feb. 2014)</u>**

203.  According to the Director Table and other DataXu documentation, Defendants Bussgang (of Flybridge Capital Partners), Fagnan (of Atlas Venture), Jarve (of Menlo Ventures), and Butler (of Thomvest Ventures) each purchased 1,348,435 shares of Series E preferred stock

at about $1.85 per share for capital contributions of $2.5 million each and a combined total of $10 million.

204.  DataXu did not file a Form D for the offering and sale of $26 million of Series E preferred stock.

205.  On information and belief, DataXu's failure to file additional Forms D for sales of preferred stock rendered DataXu subject to an injunction from future use of Regulation D under Rule 507, issued by the SEC under the Securities Act, 17 C.F.R. § 230.507.

206.  On information and belief, among the rights provided to holders of DataXu Series E preferred stock was the right to appoint directors to DataXu's BOD.

207.  Defendant Bussgang, who was a general partner with Defendant Flybridge Capital Partners, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Flybridge Capital Partners and to ensure the maximum return to that partnership's investment in DataXu through its funds, Flybridge Capital Partners III, L.P. and Flybridge Network Fund III, L.P.

208.  Defendant Fagnan, who was a partner with Defendant Atlas Venture, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Atlas Venture and to ensure the maximum return to that partnership's investment in DataXu through its fund, Atlas Venture Fund VIII, L.P.

209.  Defendant Jarve, who was a partner with Defendant Menlo Ventures, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management

and (2) he was to serve as an agent of Defendant Menlo Ventures and to ensure the maximum

return to that partnership's investment in DataXu through its funds, Menlo Ventures X, L.P.,

Menlo Entrepreneurs Fund X,, L.P.; and MMEF X, L.P.

210.  Defendant Butler, who was a managing director with Defendant Thomvest Ventures,

was appointed by his firm to serve on DataXu's BOD. His role on DataXu's BOD had a dual

nature: (1) he was to serve as a director of DataXu and assist the other directors in advising

management and (2) he was to serve as an agent of Defendant Thomvest Ventures and to ensure

the maximum return to that firm's investment in DataXu through its funds, Thomvest Ventures

Ltd. and Thomvest Venture Capital SRL.

**Round F: $9.25/$10/$20 million in DataXu Series E preferred stock (2015 or 2016)**

211.  According to DataXu's Financial Statements, which, as described further below, were

disclosed in a filing by Roku in March 2020, DataXu's BOD approved the sale of 5,019,639

shares of DataXu's Series F preferred stock for $10 million, at $1.9922 per share.

212.  According to the Director Table and other DataXu documentation, Defendants

Bussgang, Fagnan Jarve, and Butler (and their affiliated funds and entities) accounted for $9.25

million of the $10 million as follows:

a.    Defendant Bussgang (for Defendant Flybridge Capital Partners) purchased

627,455 shares of Series F preferred stock at about $1.99 per share for a capital

contribution of $1.25 million;

b.    Defendant Fagnan (for Defendant Atlas Venture and ) purchased 1,003,928

shares of Series F preferred stock at about $1.99 per share for a capital

contribution of $2 million;

    c.      Defendants Jarve (for Menlo Ventures) and Butler (for Thomvest Ventures) each purchased 1,505,892 shares of Series F preferred stock at about 1.99 per share for capital contributions of $3 million each and combined total contribution of $6 million.

    d.      Defendants Bussgang, Fagnan, Jarve, and Butler's purchases totaled $9.25 million.

    e.      Plaintiffs do not know who purchased the remaining $750,000 of DataXu's Series F preferred stock.

213.  On information and belief, among the rights provided to holders of DataXu Series F preferred stock was the right to appoint directors to DataXu's BOD.

214.  Defendant Bussgang, who was a general partner with Defendant Flybridge Capital Partners, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Flybridge Capital Partners and to ensure the maximum return to that partnership's investment in DataXu through its funds, Flybridge Capital Partners III, L.P. and Flybridge Network Fund III, L.P.

215.  Defendant Fagnan, who was a partner with Defendant Atlas Venture and a founding partner with Accomplice Management, LLC, was appointed by these firms to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Atlas Venture and Accomplice Management, LLC and to ensure the maximum return to those firms' investments in DataXu through their funds, Atlas Venture Fund VIII, L.P., Accomplice Fund I, L.P.; and Accomplice Fund II, L.P.

216.  Defendant Jarve, who was a partner with Defendant Menlo Ventures, was appointed by his partnership to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendant Menlo Ventures and to ensure the maximum return to that partnership's investment in DataXu through its funds, Menlo Ventures X, L.P., Menlo Entrepreneurs Fund X,, L.P.; and MMEF X, L.P.

217.  Defendant Butler, who was a managing director with Defendant Thomvest Ventures, was appointed by his firm to serve on DataXu's BOD. His role on DataXu's BOD had a dual nature: (1) he was to serve as a director of DataXu and assist the other directors in advising management and (2) he was to serve as an agent of Defendants Thomvest Ventures and to ensure the maximum return to that firm's investment in DataXu through its funds, Thomvest Ventures Ltd. and Thomvest Venture Capital SRL.

218.  The chart below represents DataXu's information that Plaintiffs obtained concerning capital contributions of Defendants in Rounds D, E, and F, and represents Series D, E, and F preferred stock:

| Date Acquired | Name of Director / Buyer | | Total shares | Price per share | Total paid |
|---|---|---|---|---|---|
| | Last | First | | | |
| **Series D preferred stock** | | | | | |
| 01/00/14 | Bussgang | Jeffrey | 1,824,901 | 1.6439 | 2,999,997.09 |
| 01/00/14 | Fagnan | Jeffrey | 1,824,901 | 1.6439 | 2,999,997.09 |
| 01/00/14 | Jarve | John | 3,041,503 | 1.6439 | 4,999,997.34 |
| 01/00/14 | Butler | Donald | 9,124,513 | 1.6439 | 14,999,998.61 |
| | **Subtotal** | | **15,815,818** | | $ **25,999,990.14** |
| **Series E preferred stock** | | | | | |
| | Bussgang | Jeffrey | 1,348,435 | 1.8540 | 2,499,999.84 |
| | Fagnan | Jeffrey | 1,348,435 | 1.8540 | 2,499,999.84 |
| | Jarve | John | 1,348,435 | 1.8540 | 2,499,999.84 |
| | Butler | Donald | 1,348,435 | 1.8540 | 2,499,999.84 |
| | **Subtotal** | | **5,393,740** | | $ **9,999,999.35** |
| **Series F preferred stock** | | | | | |
| | Bussgang | Jeffrey | 627,455 | 1.9922 | 1,250,000.16 |
| | Fagnan | Jeffrey | 1,003,928 | 1.9922 | 2,000,000.26 |
| | Jarve | John | 1,505,892 | 1.9922 | 3,000,000.40 |
| | Butler | Donald | 1,505,892 | 1.9922 | 3,000,000.40 |
| | **Subtotal** | | **4,643,167** | | $ **9,250,001.22** |

219.  On August 24, 2015, Defendants caused DataXu to file an Amended and Restated Certificate of Incorporation for the Corporation with the Secretary of State of the State of Delaware (the "2015 Certificate"), a document not publicly available.

220.  On information and belief, the 2015 Certificate was DataXu's last amended certificate of incorporation.

### DATAXU'S FINANCIAL STATEMENTS (FILED BY ROKU IN MAR. 2020)

221.  On March 3, 2020, Roku filed a Form 10-K for the year ended December 31, 2019 ("Roku's 10-K") that included, as Exhibit 99.1, a copy of DataXu's audited financial statements for the years ended December 31, 2018, 2017, and 2016 ("Financial Statements").

222.  These are the only financial statements to which Plaintiffs have ever had access.

**<u>DataXu's series F preferred stock: $10 or $20 million? 2015 or 2016?</u>**

223.  DataXu's consolidated statements of cash flows for years ended December 31, 2018, 2017, and 2016 shows, in *fiscal year 2016*, receipt of $10 million in cash proceeds from sales of Series F redeemable convertible preferred stock, net of issuance costs.

224.  DataXu's Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholder's Deficit for the years ended December 31, 2018, 2017, and 2016 references the issuance of Series F preferred stock, *before December 31, 2015*, totaling 5,019,639 shares for $10 million; the statement does not show additional issuances of Series F preferred stock through December 18, 2018:

**DataXu, Inc.**
**Consolidated Statements of Redeemable Convertible Prefer**
**Years ended December 31, 2018, 2017 and 2016**
**In 000's, except for number of shares**

| | Redeemable Convertible Preferred Stock | |
| --- | --- | --- |
| | Shares | Amount |
| Balances at December 31, 2015 | 104,767,897 | $  88,798 |
| Issuance of Series F redeemable convertible preferred stock | 5,019,639 | 10,000 |

225.  These two statements are inconsistent regarding the year of issuance, but Note 8 to the Financial Statements seems to have doubled the Series F preferred stock issued from 5,019,639 shares to 10,039,279 shares, and proceeds from $10 million to $20 million. This seems inexplicable unless Defendants raised another $10 million from sales of Series F preferred stock from January 1, 2019, to November 8, 2019.

8. **Redeemable Convertible Preferred Stock and Stockholders' Deficit**

The rights and privileges of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series C-1 Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, and Series F Preferred Stock (collectively, "Preferred Stock") are described below:

| | Shares Authorized | Shares Issued/ Outstanding | Liquidation Value | 2018 | 2017 |
|---|---|---|---|---|---|
| Series A | 39,405,799 | 39,078,906 | $ 8,206 | $ 9,468 | $ 9,462 |
| Series B | 21,950,017 | 21,950,017 | 11,000 | 10,997 | 10,994 |
| Series C | 16,263,732 | 16,263,732 | 20,000 | 19,997 | 19,994 |
| Series D | 18,249,022 | 18,249,022 | 30,000 | 29,991 | 29,982 |
| Series E | 5,393,740 | 5,393,740 | 10,000 | 9,997 | 9,994 |
| Series F | 10,039,279 | 10,039,279 | 20,000 | 19,967 | 19,938 |
| **Total** | **111,301,589** | **110,974,696** | **$ 99,206** | **$100,417** | **$100,364** |

## THE 2017 CONVERTIBLE NOTES (OCT. AND NOV. 2017)

226. DataXu's Financial Statements, specifically, the Consolidated Statement of Cash Flows for the years ended December 31, 2018, 2017, and 2016, show DataXu's receipt in 2017, of $7,458,000 in proceeds from issuance of convertible debt.

227. DataXu's Financial Statements also state [all amounts in 000's]:

    a. "In October and November 2017, the Company issued $7,512 of convertible notes ("2017 Convertible Notes") to existing shareholders of the Company [$54,000 more than represented in the paragraph above] which bear interest at an annual rate of 6% with a maturity dates of October 10, 2018 and November 10, 2018."

    b. "On October 3, 2018, the maturity date of the 2017 Convertible Notes was extended until March 10, 2019 and April 10, 2019, respectively."

    c. "In March 2019, the maturity date of the 2017 Convertible Notes was extended until March 2020."

    d. "The notes may be converted into shares of Series F redeemable convertible preferred stock at the original issuance price of $1.99."

e.    "Upon certain financing events occurring between the issuance of the 2017 Convertible Notes and the maturity date, the notes automatically convert into shares of the equity financing at 85% of the issuance cost."

f.    "The conversion features were recorded at fair value as a discount to the debt of $139 upon issuance. As of December 31, 2018 and 2017, the fair value of the conversion features was valued at $137 with the change in fair value of $2 recorded as a component of other expense in 2017."

g.    "Total interest expense was $451 and $131 for the years ended December 31, 2018 and 2017, respectively."

h.    "Upon any change of control event, the holders will be due a payment of 2.5 times the combined balance of outstanding principal and accrued interest as of the date of the change of control event."

228.  In addition, the maturity date of the existing 2017 Convertible Notes originally issued in October 2017 was extended until March 27, 2020.

229.  In DataXu's Financial Statements, specifically its Consolidated Balance Sheets as of December 31, 2018, and 2017, the 2017 Notes appears as current liabilities of $8,037 as of December 31, 2018, and $7,375 as of December 31, 2017.

THE 2019 CONVERTIBLE NOTES ($4 MILLION) (MAR. 2019)

230.  DataXu's Financial Statements also state:

a.    "On March 27, 2019, the Company issued $4 million of convertible notes ("2019 Convertible Notes") to existing shareholders of the Company which bear interest at an annual rate of 6% with a maturity date of March 27, 2020."

    b.     "The notes may be converted into shares of Series F redeemable convertible preferred stock at the original issuance price of $1.99."

    c.     "Upon certain financing events occurring between the issuance of the 2019 Convertible Notes and the maturity date, the notes automatically convert into shares of the equity financing at 85% of the issuance cost."

    d.     "Upon any change of control event, the holders will be due a payment of 3.0 times the combined balance of outstanding principal and accrued interest as of the date of the change of control event."

231.  A "change of control event" for both the 2017 Convertible Notes and the 2019 Convertible Notes included a sale (of assets or stock) or merger of DataXu.

232.  The change of control event occurred before March 27, 2020, which triggered DataXu's obligation to pay 2.5 times and 3.0 times the combined balance of outstanding principal and accrued interest as of the date of the change of control event on the 2017 convertible notes and 2019 convertible notes, respectively.

233.  On information and belief, the chart below represents the amounts paid to Defendants for their respective interests in the 2017 Convertible Notes and 2019 Convertible Notes:

| Date Acquired | Name of Director / Buyer Last | First | Total shares | Price per share | Total paid |
|---|---|---|---|---|---|
| | **Convertible Promissory Notes** | | | | |
| | Bussgang | Jeffrey | | | 750,000 |
| | Fagnan | Jeffrey | | | 3,000,000 |
| | Jarve | John | | | 3,000,000 |
| | Butler | Donald | | | 2,250,000 |
| | **Subtotal** | | | $ | 9,000,000.00 |

**DEFENDANTS' EXIT**

234.  Prior to October 22, 2019, Defendants retained GCA Advisors to market DataXu or its assets to a potential acquirer.

235.  On October 22, 2019, the Corporation entered into a Merger Agreement with Roku, Inc. for the purchase of the Corporation for cash and equity consideration of $150 million.

236.  On November 8, 2019, Defendants, acting for DataXu, and Roku, closed the Merger Agreement dated October 22, 2019, and DataXu merged into another corporation, DataXu International ("DXI"), which is a wholly owned subsidiary of Roku.

**DEFENDANTS NOTIFIED PLAINTIFFS OF THE MERGER AGREEMENT**

237.  In an agreement dated October 22, 2019, DataXu's majority common stockholders and board of directors ("BOD") agreed to sell DataXu to Roku, Inc. ("Roku") and merge the Corporation into Roku.

238.  On or after October 22, 2019, DataXu sent a separate copy of its "Notice Under Section 228 of the Delaware General Corporation Law" to each of the Plaintiffs (the "Notice").

239.  The Notice stated that "the holders of the requisite number of shares of DataXu capital stock" who had executed resolutions set out in a Written Consent and Agreement of Stockholders" ("Stockholder Agreement") had approved "the merger of a wholly owned subsidiary of Roku" with and into DataXu, "with DataXu being the surviving Corporation and wholly owned subsidiary of Roku."

240.  The Notice attached an unsigned form of the Stockholder Agreement as "Exhibit A," which stated that the BOD "has (i) approved the Agreement and Plan of Merger (the "Merger Agreement"), dated as of October 22, 2019, by and among Roku, Inc., a Delaware corporation ("Parent"), Delaware Acquisition Corporation, Inc., a Delaware corporation and a wholly owned

subsidiary of Parent (the "Merger Sub"), the Corporation and Shareholder Representative

Services LLC, a Colorado limited liability Corporation, solely in its capacity as the Stockholder

Representative . . . . "

241.  The Notice stated in bold print: "**Due to the respective claims of priority of each**

**series of DataXu Preferred stock pursuant to DataXu's Amended and Restated Certificate**

**of Incorporation, holders of DataXu Common Stock will not receive proceeds in this**

**transaction.**" Also receiving no proceeds in the transaction was the sole owner of C-1 Preferred

stock, Plaintiff Berlik.

242.  Plaintiffs first learned of Defendants' set up and implementation of the deemed-

liquidation device and the retention-agreement device on or after October 22, 2019, by means of

the Notice and accompanying information of that date; information about the insider loans (the

insider-loans device) was never reported to Plaintiffs but was only revealed in Roku's March

2020 filings with the SEC.

**DEFENDANTS IMPLEMENTED THE DEEMED-LIQUIDATION DEVICE**

243.  On November 8, 2019, Defendants implemented the deemed-liquidation device.

244.  Roku's Form 10-K for 2019, filed with the SEC on March 2, 2020, contains a

"Liquidation Preference" discussion in DataXu's audited "Consolidated Financial Statements for

December 31, 2018, 2017 and 2016." (Ex. 99.1). This discussion contained material information

that Defendants never provided to Plaintiffs, including:

        a.     "The holders of the Preferred stock have preferences in the event of any

                voluntary or involuntary liquidation, dissolution, or winding up of the

                corporation, including a merger or consolidation."

b.   "Upon a liquidation event, the preferred stockholders are entitled to be paid out of the assets of the Corporation available for distribution to its stockholders before any payment shall be made to the holders of common stock or any other class or series of stock ranking on liquidation junior to the Series A, Series B, Series C, Series D, Series E and Series F Preferred stock an amount equal to approximately $0.21, $0.50, $1.23, $1.64, $1.85 and $1.99 per share, respectively."

c.   "Thereafter, any remaining assets available for distribution would be distributed among the holders of shares of Series C-1 Preferred stock at an amount $1.23 per share. Thereafter, any remaining assets available for distribution would be distributed among common stockholders."

245.  DataXu common stock was extinguished and, to avoid federal income taxation, Defendants, who were among DataXu's capital stockholders, received 50% in shares of the acquiring company, which were nontaxable.

### DEFENDANTS IMPLEMENTED OTHER CONTRIBUTION-SHIFTING DEVICES

246.  On November 8, 2019, Defendants implemented one or more Contribution-Shifting Devices to take Plaintiffs' shares of DataXu's contributed capital (and any excess above their contributed capital) for Defendants' exclusive benefit.

247.  According to DataXu's Financial Statements, in November 2019—after the Merger Agreement and before the closing—Defendants altered DataXu's accounting for redeemable convertible preferred stock. Under the caption, "Accounting for Redeemable Convertible Preferred Stock," the Financial Statements state (amounts in thousands):

a.  "[i]n November 2019, the Company retrospectively adjusted the method for which it accounts for Redeemable Convertible Preferred Stock to conform with public company standards."

b.  "For SEC registrants, redeemable securities that are not liabilities are reported in mezzanine equity on the balance sheet."

c.  "Therefore, the Company has changed the classification for these equity instruments and has presented its Redeemable Convertible Preferred Stock as mezzanine equity. As a result, the Company reclassified $100,417, $100,364, $99,049, and $88,798 of amounts previously presented within stockholders' deficit as of December 31, 2018, 2017, 2016 and 2015."

### DEFENDANTS IMPLEMENTED THE INSIDER-LOAN DEVICE

248.  The total of principal and interest owed on the 2017 Convertible Note and 2019 Convertible Note cumulatively was satisfied as part of Dataxu's merger with Roku. In the Notice, Defendants reported that:

a.  "The holders (the 'Noteholders') of Dataxu's subordinated convertible promissory notes issued pursuant to the Subordinated Convertible Note Purchase Agreement, dated as of October 10, 2017 and the Subordinated Convertible Note Purchase Agreement, dated as of March 26, 2019, in each case, by and among Dataxu and the investors party thereto (the 'Notes') will become entitled to receive Merger Consideration, partly in cash and partly in shares of Roku Class A Common Stock, as repayment of the Notes."

b.  "Each Noteholder will contribute on a pro rata basis to the Escrow Funds based on the amount of Merger Consideration received by such Noteholder."

c.   "Only cash will be deposited in the Escrow Funds. Therefore, the amount of cash otherwise payable to Noteholders at the Closing will be reduced by the amount of cash deposited in the Escrow Funds."

249.  The Notice stated that "$15,000,000 in cash of the merger consideration will be deposited in an escrow account (the "Escrow Fund") to secure the indemnification obligations of Dataxu's equity holders, convertible promissory note holders and participants in Dataxu's Retention Plan."

250.  On information and belief, Defendants agreed and approved the payment to certain Defendants holding the 2017 and 2019 Convertible Notes of 2 to 3 times the total principal and interest. These payments were simply corrupt economic rents that had the effect to shifting contributions to these certain Defendants.

## DEFENDANTS IMPLEMENTED THE RETENTION-PLAN DEVICE

251.  The BOD approved a $17.5 Million "Retention Bonus" to the retention participants as part of the Dataxu merger with Roku.

252.  On information and belief, the retention participants included the Founders and Baker, Defendants herein.

253.  The exit options included set up and implementation of one or more the following Contribution-Shifting Devices:

a.   The arrangement and approval of the treatment of a sale or merger of DataXu as a "liquidation," as revealed by DataXu's certificates of incorporation (original, amended, and restated): (1) to prevent application of the default distribution principle of *pari passu* (equal footing); and (2) to promote application of a preferential corporate-asset distribution scheme to enable

58

Defendants to recover their contributed capital at the expense of Plaintiffs'
recovery of their contributed capital (the "deemed-liquidation device");

b.  The arrangement and approval of insider loans to DataXu by which they
obligated DataXu, upon the sale or merger of DataXu, to repay the outstanding
amount of <u>principal and interest</u> at 250% or 300% of the total amount (the
"insider-loan device"); and

c.  The arrangement and approval of a retention plan by which Defendants had
DataXu agree to pay an exorbitant amount to "retain" the individual Defendant
Founders and Defendant Baker pending the Corporation's sale or merger (the
"retention-agreement device").

### PAYOUTS TO PLAINTIFFS UNDER THE MERGER AGREEMENT

254.  Defendants' Notice (to Plaintiffs and others) disclosed that (1) the total merger
consideration for DataXu would be $150 million, of which $75 million would be in cash and $75
would be in Roku (class A) common stock, and (2) the holders of DataXu common shares and
DataXu Series C-1 preferred stock would receive $0 of the $150 million.

255.  Defendants' Notice stated that the cash portion of the total merger consideration, $75
million, would be reduced by amounts required:

a.  To repay outstanding indebtedness (estimated to be approximately
$32,000,000);

b.  To repay a portion of the principal, accrued interest and repayment premiums
on outstanding investor bridge notes in the aggregate principal amount of
$11,549,746 (exclusive of a repayment premium pursuant to the terms of such

notes) (the cash portion of the repayment amount is estimated to be approximately $9,470,143);

c.   To pay third-party expenses in connection with the Merger, including investment banking fees to GCA Advisors, LLC and legal fees (estimated to be approximately $3,500,000); and

d.   To pay the Retention Plan payments ($17,250,000) (the "Retention Plan Amount");

256.  Defendants' Notice stated that the stock portion of the total merger consideration, $75 million, would be reduced by "the value of the shares of Roku Class A Common Stock issuable to holders of convertible notes (valued at approximately $24,202,325)."

257.  Under the Merger Agreement, the Senior Revolving Credit Facility and the 2017 and 2019 Convertible Notes were repaid *in full* as part of the closing proceeds.

258.  The Merger Agreement attached as Exhibit 2.1 to Roku's Form 10-K for fiscal year ended December 31, 2019, filed on March 3, 2020, defines the merger consideration as follows:

a.   "'Total Consideration'" shall mean a dollar amount equal to the sum of the Total Cash Consideration and the Total Stock Consideration (with the Total Stock Consideration to be valued for this purpose at the Parent Trading Price)." (Notice, at A-13).

b.   "'Parent Trading Price' is defined to mean $131.23." (*Id.*, at A-9).

c.   "'Total Stock Consideration' shall mean 571,516 shares of Parent Common Stock." (*Id.*, at A-13).

d.   "'Total Cash Consideration' shall mean a dollar amount equal to the Cash Purchase Price, less (i) Indebtedness (excluding for this purpose the Company

Notes) and less (ii) Third Party Expenses set forth on the Statement of

Expenses, whether or not paid prior to the Effective Time or due and payable at

or after the Effective Time." (*Id.*, at A-13).

**ROKU'S PAYMENT TO DEFENDANTS UNDER THE MERGER AGREEMENT**

259.  Roku's Form 10-K for fiscal year ended December 31, 2019, filed on March 3, 2020,

states that:

a.   "The total purchase consideration for dataxu was **$147.3 million**, which

consisted of **$77.6 million in cash** and $69.7 million for the fair value of the

Company's 571,459 shares of Class A common stock. Pursuant to the Merger

Agreement, the Company had deposited $18.8 million into an escrow account

to secure certain indemnifications and other potential obligations. As of the

year ended December 31, 2020, a balance of $13.6 million is unreleased and

remains in the escrow account" (Form 10-K, at 90).

b.   "We completed the acquisition of dataxu, Inc. in November 2019 for a total

purchase consideration of **$148.4 million**, which consisted of **$78.7 million in**

**cash** and $69.7 million for the fair value of our 571,459 shares of common

stock" (*Id.*, at 62).

c.   "On November 8, 2019 we acquired dataxu, Inc. for aggregate consideration of

**$78.7 million in cash** and 571,459 shares of our Class A common stock" (*Id.*,

at 42).

d.   "Our investing activities used cash of $110.3 million for the year ended

December 31, 2019. The **cash** used comprised of . . . **$68.1 million** related to

the acquisition of dataxu, Inc." (*Id.*, at 67).

260.  The closing price of Roku's common stock on Friday, November 8, 2019, was $121.94 per share.

261.  At the closing price of $121.94 per share, 571,459 shares equals approximately $**69.7 million** ($69,683,710.46). When added to $77.6 million or $78.7 million in cash, the total consideration equals about $147.3 million or $148.4 million, respectively.

262.  Defendants and Roku agreed to pay a $17.5 million "retention bonus" to keep certain corporate insiders for the three-month period until the transaction closed:

> a.   Insiders, including the beneficiaries of the exorbitant "retention bonus," received their payouts while the minority "investors" received $0 in exchange for ten years of "ownership."

> b.   Defendants did not have to implement Contribution-Shifting Devices. No sooner than October 22, 2019, and even before November 8, 2019, Defendants were free to not implement the Contribution-Shifting Devices and cause Plaintiffs economic loss.

263.  Defendants had the ability to prevent a sale or merger of DataXu from being a so-called "Deemed Liquidation Event," if Defendants, "the (i) holders of a majority of the outstanding shares of Preferred stock (other than the Series C-1 Preferred stock) and (ii) holders of a majority of the outstanding shares of Series D Preferred stock *elect otherwise* by written notice sent to the Corporation at least ten (10) days prior to the effective date of any such event: (a) a merger or consolidation in which (i) the Corporation is a constituent party . . . ." (2015 Certificate, § B.2.3.1) (emphasis added).

264.  The closing price of Roku's common stock on Friday, October 10, 2021, was $323.36 per share.

265.  The Roku common stock given to Defendants as 50% of the purchase price for DataXu, if held through October 10, 2021, would have yielded a gain of more than $115.1 million for Defendants, in addition to the value of Roku shares at closing, which was approximately $69.7 million.

## COUNT I

## CLAIM FOR DISCLOSURE FRAUD

AGAINST DEFENDANTS UNDER § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER FOR DEFENDANTS' FRAUDULENT MATERIAL OMISSIONS IN THE OFFER AND SALES OF SECURITIES TO PLAINTIFFS

266.  Plaintiffs incorporate all prior paragraphs into this paragraph as if fully restated herein.

267.  Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], promulgated thereunder, create implied rights of action for Plaintiffs. Each Plaintiff herein has a separate implied right of action against each Defendant and against Defendants collectively.

268.  Section 10(b) of the Exchange Act forbids the use of any manipulative or deceptive device in contravention of the SEC's rules and regulations for the protection of investors. Rule 10b-5, adopted pursuant to section 10(b), prohibits fraudulent devices and schemes, material misstatements and omissions of any material facts, and acts and practices that operate as a fraud or deceit on any person in connection with the purchase or sale of a security.

269.  None of the Defendants informed any of the Plaintiffs about any of the Contribution-Shifting Devices when Plaintiffs provided consideration for DataXu securities.

270.  Defendants knew or were reckless in not knowing that:

a. They had not informed Plaintiffs about Defendants' exit options and their set up and use of one or more Contribution-Shifting Devices;

b. The unrevealed information about Defendants' exit options and their set up and use of one or more Contribution-Shifting Devices would have been material to anyone paying value for DataXu securities;

c. The disclosure of information about Defendants' exit options and their set up and use of one or more Contribution-Shifting Devices would have deterred Plaintiffs or any reasonable investor from giving value to the Corporation in exchange for DataXu securities; and

d. The absence of information about Defendants' exit options and their set up and use of one or more Contribution-Shifting Devices misrepresented the real state of Plaintiffs' investments in the Corporation.

271. Defendants did not offer Plaintiffs any put option or offer to repurchase the securities sold to Plaintiffs.

272. Defendants Bussgang, Fagnan, Jarve, and Butler, at all relevant times herein, in addition to acting on their own behalf, also acted as authorized agents of their respective affiliated entities:

a. Defendant Bussgang acted as agent for for Flybridge Capital Parners II, L.P. and Flybridge Network Fund II, L.P., preferred stockholders of Series A, B, C, D, E, and F preferred stock and convertible promissory noteholders in the principal amount of $750,000;

b. Defendant Fagnan acted as agent for Atlas Venture Fund VIII, L.P., Accomplice Fund I, L.P.; and Accomplice Fund II, L.P., preferred stockholders

of Series A, B, C, D, E, and F preferred stock and convertible promissory noteholders in the principal amount of 3,000,000;

c.      Defendant Jarve acted as agent for Menlo Ventures X, L.P., Menlo Entrepreneurs Fund X,, L.P.; and MMEF X, L.P., preferred stockholders of Series B, C, D, E, and F preferred stock and convertible promissory noteholders in the principal amount of $3,000,000;

d.      Defendant Butler acted as agent for Thomvest Ventures Ltd. and Thomvest Venture Capital SRL, preferred stockholders of Series D, E, and F preferred stock and convertible promissory noteholders in the principal amount of $2,250,000

273.  Plaintiffs reasonably relied, to their detriment, on the statements and misstatements made to them by Defendants and Defendants' agents in making decisions to purchase DataXu shares and, in the case of Plaintiff Berlik, to accept DataXu C-1 Preferred shares as partial payment for the sale of Mexad to DataXu.

274.  Plaintiffs suffered the economic losses complained of herein, namely, reduction of their pro-rata portion of their contributions for their shares, as a consequence of Defendants' sale of DataXu to Roku on November 8, 2019, when Defendants extinguished their stock and executed the Contribution-Shifting Devices to shift Plaintiffs' share of contributed capital to themselves.

275.  If Defendants had not set and then executed the Contribution-Shifting Devices, Plaintiffs would not have suffered the economic losses that they suffered and would have, instead, shared in Defendants' gains upon the sale of the Corporation through their proportionate ownership interests in Dataxu.

276.   Defendants' material misrepresentations, made by omissions, half-truths, and otherwise, caused Plaintiffs to purchase DataXu securities with various forms of consideration, but the failure to disclose to Plaintiffs the risks of Defendants' use of Contribution-Shifting Devices did not cause economic harm to Plaintiffs until November 8, 2019, when these devices were put into effect.

277.   The insider-loan device and the retention-plan device were designed and succeeded in shifting Plaintiffs' contributions to DataXu to Defendants: (1) The insider-loan device was a mechanism designed and employed to compensate certain Defendants for losses on DataXu's earlier financing rounds; and (2) The retention-plan device was a mechanism designed and employed to insure that the common shareholders holding the majority of DataXu common stock and the former CEO, Baker, would accommodate the desires and financial interests of the other Defendants.

278.   Defendants also had ability to not agree to employ the insider-loan device, which paid certain Defendants two to three times the total principal and interest due, for a total of up to about $36 million on investments totaling approximately $12 million.

279.   Defendants had the ability to not agree to employ the retention-plan device, which paid common shareholders, including the Defendant Founders and Defendant Baker, and possibly other Defendants, $17.25 million to "remain" with DataXu for a period of three or four months during the Merger Transaction.

280.   Plaintiffs' claims against Defendants accrued when and only when they incurred economic losses, which was on November 8, 2019, when the merger with Roku extinguished their DataXu securities.

281.  Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder for making material false statements, omitting material information without which statements Defendants made were materially misleading, and for planning, designing, and implementing the fraudulent schemes and devices identified herein.

### DEFENDANTS WERE "CONTROL PERSONS" AND "CONTROLLING PERSONS"

282.  Section 15(a) of the Exchange Act [15 U.S.C. § 77o(a)] ("§ 15(a)"), entitled, "Controller Persons," states that "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

283.  Rule 405 under the Securities Act [[17 C.F.R. § 230.405], defines the term "control," as used separately or in the terms or expressions "controlling," "controlled by" and "under common control with," as the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise".

    a.    A control person under the federal securities laws includes a person who has the power (1) to direct corporate management and policies and (2) to compel the issuer to file a registration statement under the Securities Act.

b.    Directors and senior officers of a corporation and owners of ten (10%) percent or more of a corporation are presumptively in a position of control of the corporation.

284. Defendants were "control persons" of DataXu under § 15(a) and DataXu was a "controlled person" under § 15(a).

285. Section 20(a) of the Exchange Act, [15 U.S.C. § 78t(a)] ("§ 20(a)"), entitled "Liability of controlling persons and persons who aid and abet violations," states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

286. Each offering participant, including the issuer, its officers and directors, the underwriters, accountants and other experts, is potentially liable under this provision.

287. Defendants were "controlling persons" of DataXu under § 20(a) and DataXu was a "controlled person" under § 20(a).

288. Section 20(a) of the Exchange Act imposes liability on any person who directly or indirectly controls any person liable under Section 10(b) or Rule 10b-5, to the same extent as the controlled person.

289. Section 15 of the Securities Act and Section 20 of the Exchange Act have been interpreted as parallel provisions.

244. Defendants are jointly and severally liable for all claims made herein under the Securities Act and Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant:

(1)    Judgment granting them full recovery of the purchase prices, paid in cash or in kind, for the DataXu securities that Plaintiffs would not have purchased but for Defendants' fraudulent acts, statements, and omissions, and which Defendants extinguished on November 8, 2019;

(2)    Judgment granting them benefit of the bargain damages, measured by Plaintiffs' share of gains upon the sale of the Corporation through their proportionate ownership interest in Dataxu, which they would have obtained absent Defendants' fraudulent acts, statements, and omissions;

(3)    Costs and attorneys' fees; and

(4)    Any other relief to which this Court deems Plaintiffs entitled.

_/s/ Sara M. Lord_____
Sara Lord (BBO No. 546918)
Cory C. Kirchert
Adriaen M. Morse Jr.
ARNALL GOLDEN GREGORY LLP
1775 Pennsylvania Avenue, N.W., Suite 1000
Washington, DC 20006
Tel: (202) 677-4054
Fax: (202) 677-4969
Email: sara.lord@agg.com